KIMBALL, C.J.
 

 | jOn May 17, 2006, Felton Dejuan Dorsey and Randy Wilson were indicted by a Caddo Parish grand jury for the first degree murder of Joe Prock and attempted first degree murder of Bobbie Prock. The state subsequently dismissed the latter charge against both by amendment. On May 18, 2006, the state gave notice of its intention to seek the death penalty at Dorsey’s (hereinafter “defendant”) trial, alleging five aggravating factors. On May 4, 2009, the state filed an amended notice of intent to seek the death penalty, reducing the alleged aggravating factors to the following three: (1) defendant was engaged in the perpetration or attempted perpetration of aggravated rape, aggravated kidnapping, aggravated burglary, aggravated
 
 *610
 
 arson, aggravated escape, armed robbery or simple robbery; (2) defendant knowingly created a risk of death or bodily harm to more than one person; and (3) defendant offered, has been offered, has given, or has received anything of value for the commission of the offense. In the week proceeding trial, Wilson entered a plea agreement with the state, agreeing to testify at defendant’s trial in exchange for pleading guilty to murder, thereby avoiding a ^capital murder trial, and receiving a sentence of life imprisonment without benefit of probation, parole, or suspension of sentence.
 

 The district court appointed the Caddo Parish Public Defender’s Office to represent Dorsey and attorney Alan Golden was assigned to the case. Jury voir dire began on May 11, 2009, and was completed on May 18, 2009. Defendant exercised all twelve of his peremptory challenges, while the state only exercised eleven. The defense asserted a
 
 Batson
 
 challenge, alleging the state used peremptory challenges to strike five of the seven black prospective jurors who remained after death qualification.
 
 [1]
 

 Batson v. Kentucky,
 
 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The district court initially ordered the state to provide race neutral reasons for striking the jurors and the state objected, arguing statistics alone could not provide prima facie evidence of purposeful discrimination. The state further asserted it consistently used peremptory challenges to eliminate all prospective jurors, regardless of race, who rated themselves a “four” or higher on the state’s five-point scale, indicating a preference in favor of imposing a life sentence. After hearing the state’s response, the district court found the defense had not made a prima facie case of racial discrimination and set aside its previous order. The racial composition of the jury was eleven whites and one black.
 

 Trial began on May 19, 2009, and was completed on May 26, 2009. The jury deliberated for forty-five minutes before unanimously finding defendant guilty of first degree murder. At trial, the state presented thirty-eight witnesses and the defense chose not to present any witnesses. The penalty phase began on May 27, 2009, and concluded on May 28, 2009, during which the state presented eight witnesses, including two former coworkers of the victim, the victim’s -wife, mother, brother, and daughter, and two additional witnesses to establish ^defendant’s five prior felony convictions. The defense presented three witnesses during the penalty phase, including a mitigation investigator, a social worker who compiled defendant’s social history, and an expert psychologist. At the conclusion of the penalty phase, the jury recommended defendant be sentenced to death.
 

 After denying defendant’s Motion for New Trial, the district court sentenced him on July 7, 2009, to die by lethal injection. Defendant’s Motion for Appeal was granted and on July 28, 2009, the Capital Appeals Project was appointed to represent him. Defendant now appeals his conviction and death sentence, under La. Const, art. V, § 5(D). In his appeal, defendant asserts twenty-six assignments of error, the most significant of which will be addressed in this opinion. After a thorough review of the law and evidence, we find none of the assignments of error constitute reversible error and therefore, we affirm defendant’s conviction and sentence.
 

 
 *611
 
 FACTS
 

 On April 1, 2006, seventy-nine-year-old Bobbie Prock (hereinafter “Ms. Prock”) was the victim of a home invasion. At trial, she testified that sometime after 12:00 p.m. on April 1, her dog alerted her to the presence of a white car and two black males standing in the driveway of her rural home in Greenwood, Louisiana, which is near Shreveport. The two men were dressed alike in dark pants, white t-shirts, and black jackets. They asked Ms. Prock whether the car in the driveway, which belonged to her son, Joe Prock, was for sale. Ms. Prock responded that it was not for sale, but because they were insistent, she wrote down her son’s phone number for them. Ms. Prock testified that when she cracked open the screen door, the taller man pulled out a gun and pointed it at her. Ms. Prock screamed and attempted to fight, but both men grabbed her and pulled her back inside the house. Although she continued to struggle, Ms. Prock ceased when the taller man put the gun to her neck.
 

 IjOnce inside, the men placed Ms. Prock in a chair, taped her wrists to the arm of the chair, and put a blanket over her head before ransacking her home. Because of the blanket, Ms. Prock could only see their lower legs and the bottom portions of some of her larger possessions as the two men carried property out of her home and loaded it into her Mercury Grand Marquis and defendant’s Chevy Caprice. According to Ms. Prock, the men became hurried and she realized there was someone else with them, whose voice she recognized as that of her son, Joe. The men forced Joe onto the floor, but Ms. Prock could only see his torso and the two men kneeling beside him, demanding to know why Joe had returned. Ms. Prock heard Joe moan followed by several loud noises, which she thought were muffled gunshots, after which Joe was silent. She then saw flames as the two men set Joe on fire and asked each other “are you ready?” before they fled. Ms. Prock struggled and was able to free herself from the chair and flag down a passing motorist after realizing that her car was gone.
 
 [2]
 

 Firefighter and paramedic Russell Barnes and Dr. Anthony Stuart both testified that Ms. Prock had first and second degree burns on her knees, back, hands, and face. According to Dr. Marcus McFarland, Coroner of Caddo Parish, Joe died of multiple blunt force head trauma with thermal injuries, or burns. John Prock, Joe’s older brother and volunteer fireman, described his efforts to combat the fire and his discovery of Joe’s burning body. John Prock noticed the fire had multiple points of origin, which included Joe. His observation was confirmed by Deputy State Fire Marshall Jim Alexander, who testified as an expert that the fire was deliberately set. Paramedic Jason Johnson and fire captain Tim Thames both testified they removed Joe from inside the home and extinguished his burning corpse.
 

 | ¿Dr. Frank Peretti, an expert in forensic pathology, performed Joe’s autopsy at the Arkansas State Crime Lab, which performs autopsies for northern Louisiana parishes. Dr. Peretti testified Joe’s wrists were bound with electrical cord and his upper body had thermal injuries. Joe had soot in his nose, mouth and larynx, but it did not extend into his lungs. There were also at least nine separate impact sites on Joe’s head. Dr. Peretti testified some of the impact sites had prominent patterns to them, indicating a specific object was used
 
 *612
 
 to inflict them. Although many of the wounds were altered as a result of the fire, Dr. Peretti identified an inverted “U-shaped” injury on Joe’s head, which indicated it was inflicted by the butt of a gun. Dr. Peretti testified the handle of the gun found at the home of Tyise Walker, defendant’s girlfriend at the time of the invasion, has a “U-shape,” consistent with Joe’s injury. Joe also suffered several skull fractures that drove bone into the brain, indicating great force was used. According to Dr. Peretti, these wounds are consistent with having been inflicted by a firearm. Dr. Peretti further testified the head wounds were fatal and Joe could have survived for only a few minutes.
 

 A week after the attack, detectives presented Ms. Prock with a photographic lineup. Ms. Prock was drawn to defendant’s eyes, but she was unable to make a positive identification. During cross-examination, Ms. Prock conceded she had consistently maintained that the taller of the two attackers drew the gun,
 
 [3]
 
 but on redirect she emphasized the two men acted in concert. Detective Scoggins confirmed Ms. Prock had reported that the taller of the two men held the gun to her neck and did most of the talking, but Scoggins noted it was common for eye witnesses to be mistaken about height.
 

 At trial, several witnesses described the course of the investigation and how defendant and Wilson were identified as the perpetrators. Deputy Martha Bryant testified the 911 call was received on April 1, 2006, at 3:38 p.m. Lieutenant lfiWilliam Rehack of the Caddo Parish Sheriffs Office was dispatched to secure the crime scene and begin the investigation. Scott Calvert of the Shreveport Fire Department advised deputies on the scene that he had passed by Ms. Prock’s home around 3:00 p.m. that day and saw Ms. Prock’s car backed up to her patio, along with an older white Chevy Caprice from the late 80s or early 90s. Jeremy Whitaker, a surveillance camera installer, provided investigators with video from a surveillance system he had previously installed at a home near Ms. Prock’s residence. After hearing about the home invasion, Whitaker reviewed footage from the camera and saw a white Caprice passing by the house around 1:18 p.m. as it drove north toward Ms. Prock’s home.
 

 Detective John Cobb of the DeSoto Parish Sheriffs Office also testified he had passed by Ms. Prock’s home that day on his way to Dallas and had traveled behind a white Caprice with two passengers in it. Cobb caught up with the Caprice as it approached Ms. Prock’s residence and noticed it had slowed down to less than 30 miles per hour in a 55 mile per hour zone. Cobb heard about the home invasion and the suspect white car on the news that evening and called investigators the next morning to give them the partial license plate information he remembered. According to Cobb, the license plate number started with a zero and ended with two identical numbers that were either sevens or nines. At trial, Cobb identified the white Caprice and his own Suburban on the surveillance video retrieved by Whitaker.
 

 Detectives were subsequently contacted by Brandy Johnson, who was a close friend and coworker of Tyise Walker, defendant’s girlfriend when the home invasion occurred. Johnson testified she saw defendant at the casino where she and Walker worked at about 11 a.m. that day. Defendant asked Johnson if she could bring Walker home after work because he was going to be out of town and could not pick her up. Johnson said she and Walker
 
 *613
 
 ended their shifts around 3:00 |7p.m. and were driving home when they saw defendant in his white Chevy Caprice driving very fast and swerving, followed by a silver Grand Marquis driving in a similar manner. Defendant pulled over on East Herndon, one street away from where Walker lived, and Johnson followed. Defendant approached the passenger side of Johnson’s vehicle wearing all black, placed an item wrapped in a white towel in Walker’s lap, and told Walker to take it home and put it away. Although the item was completely covered, Johnson told detectives she saw the tip of a silver gun and testified she could tell it was a gun when she carried it into the house and put it behind a vase after Walker refused to remove it from the vehicle. Later that day, defendant called Walker and told her to meet him on Morningside Drive at the home of Alexis “Eddie Ray” Wilson to exchange vehicles.
 

 Walker testified substantially similar to Johnson, but added defendant called her from Caddo Correctional Center and demanded she claim the gun belonged to her. Detectives subsequently obtained cell phone tower records, which showed defendant’s movements on the day of the home invasion and revealed he made several phone calls to Randy Wilson. These records placed defendant in Shreveport at 7:22 a.m. and showed he made several phone calls to Wilson after 10:00 a.m. Defendant also received a phone call in Greenwood at 2:20 p.m. and made additional calls to Wilson beginning at 8:34 p.m. in Greenwood.
 

 Before obtaining a warrant to search Walker’s residence, which she shared with defendant, investigators observed defendant’s white Caprice parked in the driveway of the home, whose license plate began with a zero and ended in “877.” On April 4, 2006, Detective Scoggins secured a warrant to search Walker’s residence, during which a Ruger P90 handgun was found with blood and hair on it, along with a black Nike jacket. According to a forensic analyst, the blood on the gun contained DNA that matched Joe Prock. A swab from the handgrip of the gun contained a mixture of DNA from which the forensic analyst could not exclude | sJoe, Ms. Prock, or defendant as the source. Wilson, however, was excluded as a possible source of this DNA. After recognizing the Nike jacket for the first time when it was exhibited at trial, Ms. Prock was recalled to testify and said it had been worn by one of her attackers. Lieutenant Owen McDonnell, testifying as an expert, said two fingerprints from the exterior storm door at Ms. Prock’s residence belonged to Wilson. McDonnell also testified Wilson’s shoes appeared to have blood on the soles and the shoelaces appeared to be singed by fire.
 

 While Walker’s home was being searched, defendant was arrested on an outstanding, unrelated warrant. Detective Scoggins testified he
 
 Mirandized
 
 defendant before conducting a recorded interview during which defendant denied any involvement in the attack. Defendant claimed he drove around that day and hung out at Dana Smith’s home before giving Walker a ride home from work. Defendant also said he remained at home for the rest of the night. Defendant denied he owned a gun, but said Walker had one to protect herself from an ex-boyfriend. Smith, a friend of defendant, testified she did not allow defendant to remain in her home when she went to work at about noon that day.
 

 At trial, Randy Wilson’s testimony was preceded by that of his attorney, Joel Pearce. Pearce testified the state entered into a “Use Immunity Agreement” with Wilson in exchange for Wilson’s statements at interviews conducted on May 15
 
 *614
 
 and 17, 2009, after which a plea agreement was reached on May 19, 2009. In exchange for his truthful testimony, Wilson would avoid capital prosecution, plead guilty to murder, and be sentenced to life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence.
 

 Wilson testified he knew defendant from growing up in the same neighborhood and defendant had told him in March he planned to commit a robbery. According to Wilson, a man named Tony had told defendant Joe Prock was about to receive a certain amount of money and Tony agreed to show |9defendant where Ms. Prock lived. Wilson testified defendant picked him up on April 1, 2006, and they followed Tony, who was driving a truck, and blew his horn to indicate when they had reached Ms. Prock’s residence. After arriving at Ms. Prock’s residence, defendant retrieved a gun from the trunk of the car before they approached the home and asked if a car in the driveway was for sale. When Ms. Prock opened the screen door, defendant grabbed her and Wilson helped carry her back into the house and restrain her. Wilson testified defendant tried to give him the gun, but he refused to take it. Wilson further testified they were both carrying items out of the house when Joe arrived and defendant pointed the gun at Joe and told him to lie down. Wilson and defendant argued when defendant insisted Joe had to die because he had seen defendant’s face and license plate.
 

 According to Wilson, he and defendant proceeded to tie Joe up before defendant put plastic bags over Joe’s head and tried to suffocate him. When that failed, defendant repeatedly struck Joe in the head with the handle of the gun, which Wilson said sounded like gunshots. The men then set several fires to eliminate evidence. Wilson assumed, but is not certain, Joe was dead when the fires were set and he knew Ms. Prock was still alive when they left her in the burning house. Defendant fled the scene in his Chevy Caprice, while Wilson fled in Ms. Prock’s Mercury Grand Marquis. Wilson testified defendant called and told him to drive less suspiciously and instructed him to go to a place where they could store the stolen items. When confronted with his prior statements to detectives, in which he first denied any involvement and then said he was at the scene of the crime as defendant’s unwilling hostage, Wilson admitted he had lied many times.
 

 Alexis “Eddie Ray” Wilson also reached a plea agreement with the state, whereby he agreed to testify in exchange for pleading guilty to possession of stolen property and receiving a two year suspended sentence. Ray testified defendant called him on the day of the attack and asked if he could store some property in | inRay’s garage. When Ray returned home that evening, he saw defendant parked by his garage and noticed the garage door was open. Ray testified Walker arrived and exchanged vehicles with defendant before they both drove away. Ray noticed several items, including a television, had been placed in his garage and after a couple days, he became nervous and decided to discard them. He gave a jar containing coins to his girlfriend Prelois Jones and after detectives contacted him, Ray showed them where he abandoned the television. Jones testified Ray gave her the coins to take to a change machine at the grocery store, but she was busy and left them at a friend’s house. When contacted by detectives, Jones retrieved the coins and gave them to police. Joe’s brother and son both testified the coin jar recovered from Jones contained several foreign coins and buffalo nickels that had belonged to Joe.
 

 
 *615
 
 Before the penalty phase, the district court evaluated the state’s proposed victim impact testimony and determined it would be admissible. The defense objected, asserting some of the testimony exceeded permissible victim impact testimony because it demonstrated Joe’s worth through his professional and volunteer work. The state presented eight victim impact witnesses, including two of Joe’s former coworkers, Joe’s wife, mother, brother, and daughter, and two additional witnesses to establish defendant’s five prior felony convictions. The defense focused on defendant’s social history, emphasizing his mother is a deceased intravenous drug user, his father is incarcerated, and he was neglected as a child. Bryn Pope, an investigator for the Caddo Parish Public Defender’s Office, interviewed defendant’s mother, Louise Dorsey, before she died on April 8, 2008, from Hepatitis C and acute cirrhosis of the liver. According to Pope, Louise began drinking, smoking marijuana, and using cocaine intravenously at age 28. Felton Sherman, who was reportedly defendant’s father, had pled guilty to possession | nwith intent to distribute a schedule II controlled dangerous substance, armed robbery, and unauthorized entry of a business, and is presently incarcerated.
 

 DISCUSSION
 

 I. Batson Challenge
 

 In his fifth assignment of error, defendant argues the district court erred in denying his
 
 Batson
 
 challenge, finding defendant failed to establish a prima facie case of racial discrimination based upon the state’s exercise of its peremptory challenges.
 
 Batson v. Kentucky,
 
 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). In
 
 Batson,
 
 the Supreme Court established a three-step process to determine whether a prosecutor used peremptory challenges in a manner violating the Equal Protection Clause. First, a defendant must make a prima facie showing that the prosecutor exercised peremptory challenges on the basis of race. 476 U.S. at 96-97, 106 S.Ct. at 1723. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. 476 U.S. at 97-98, 106 S.Ct. at 1723. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. 476 U.S. at 98, 106 S.Ct. at 1724. For a
 
 Batson
 
 challenge to succeed, a racially discriminatory result is not sufficient; instead, the result must be traced to a racially discriminatory purpose. 476 U.S. at 93, 106 S.Ct. at 1721. Thus, the sole focus of the
 
 Batson
 
 inquiry is the intent of the prosecutor at the time he exercised his peremptory strikes.
 
 Id.
 
 The holding in
 
 Batson
 
 was adopted by this Court in
 
 State v. Collier,
 
 553 So.2d 815 (La.1989), and has been codified by the legislature in Louisiana Code of Criminal Procedure article 795(C) and (D).
 
 [4]
 

 
 *616
 
 |i2In the instant case, the only issue before the Court is whether defendant met his burden of proof under the first
 
 Batson
 
 factor and established a prima facie case of purposeful discrimination in the state’s exercise of its peremptory challenges. When determining whether the defendant has made the requisite prima facie showing, the court in
 
 Batson
 
 held the trial court should consider all relevant circumstances, including a pattern of strikes against black jurors and the prosecutor’s questions and statements during voir dire examination and in exercising his challenges. 476 U.S. at 96-97, 106 S.Ct at 1723;
 
 State v. Duncan,
 
 99-2615, p. 13 (La.10/16/01); 802 So.2d 533, 544. The Court refused to provide guidance beyond these two illustrations, choosing instead to rely upon experienced trial judges to decide whether the circumstances surrounding the prosecutor’s use of peremptory challenges creates a prima facie case of discrimination.
 
 Batson,
 
 476 U.S. at 97, 106 S.Ct. at 1723;
 
 Duncan,
 
 99-2615 at 13, 802 So.2d at 545. Because the trial judge’s findings in this context will largely turn on evaluations of credibility, a reviewing court ordinarily should give those findings great deference. 476 U.S. at 98, n. 21, 106 S.Ct. at 1724.
 

 This Court, however, has provided additional guidance by enumerating several other factors Louisiana courts may consider in determining whether a defendant has made a prima facie case of purposeful discrimination. For example, in
 
 State v. Green,
 
 this Court held “the defendant may offer any facts relevant to the question of the prosecutor’s discriminatory intent to satisfy this burden.” 94-0887, p. 24 (La.5/22/95); 655 So.2d 272, 288. Such facts include, but are not limited to, a pattern of strikes by the prosecutor against members of a suspect class, statements or actions by the prosecutor that indicate the peremptory strikes were motivated by impermissible considerations, the composition of the venire and of the jury finally empanelled, and any other disparate impact upon the suspect class which is alleged to be the victim of purposeful discrimination.
 
 Id.
 
 (citing
 
 State v. Collier,
 
 553 So.2d 815 (La.1989);
 
 State v. Thompson,
 
 516 So.2d 349 (La.1987),
 
 cert. denied,
 
 488 U.S. 871, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988)). This Court has also taken into consideration whether the nature of the case presented overt racial overtones, the timing of the defendant’s objection, and whether the trial judge thought the issue of purposeful discrimination was “very close.”
 
 State v. Draughn,
 
 05-1825, pp. 26-27 (La.1/17/07); 950 So.2d 583, 603-04.
 

 In this case, the defense claims it established a prima facie case of discrimination numerically because the state used peremptory challenges to strike five of seven prospective black jurors (71%) and only six of twenty-seven prospective white jurors (22%), thereby striking black jurors at a rate of more than three times that of white jurors. The district court clarified there were eight prospective black jurors available for jury selection and the state had challenged five, one was excused by the defense, one was selected for the jury, and one was available as an alternate. The district court then found the defense had established a prima facie case of purposeful discrimination and ordered the state to provide race-neutral reasons for striking the jurors. The state objected to the court’s order and asked the court to articulate its reasons for finding a prima facie
 
 *617
 
 case of discrimination so the state could make an informed decision regarding whether it would seek appellate review. Before the court could do so, however, the state argued it only struck five out of eight black jurors, thereby lowering the percentage of black jurors struck from 71% to 62.5%. The state further claimed it struck every h Juror who rated himself as a “four” on the state’s five-point scale, regardless of race, indicating a preference towards imposing a life sentence.
 
 [5]
 
 When the court asked whether this was the state’s race neutral reason, the state responded “it is a component of it,” but further explained, “that is not a race neutral reason, that is a correction of the factual basis set for the prima facie case.” Throughout its objection, the state repeatedly emphasized it was not providing its race neutral reasons for the strikes. After hearing the state’s explanation, the court set aside its previous order and denied the
 
 Batson
 
 challenge, finding there was no systematic pattern of exclusion based upon race.
 

 Upon review, we find no abuse of discretion in the district court’s ruling. As the state noted, this Court has held bare statistics are insufficient to support a prima facie case of discrimination.
 
 State v. Duncan,
 
 99-2615, p. 22 (La.10/16/01), 802 So.2d 533, 550 (citing
 
 United States v. Moore,
 
 895 F.2d 484, 485 (8th Cir.1990)). In
 
 Duncan,
 
 the defendant argued racial discrimination could be inferred from the record, which showed that the state had struck 84% of the prospective black jurors and only 12% of the prospective white jurors, using five of its eight peremptory challenges to strike black jurors. This Court held, “there is not a per se rule that a certain number or percentage of the challenged jurors must be black in order for the court to conclude a prima facie case has been made out.” 99-2615 at 22, 802 So.2d at 549-50. However, the Court explained “such number games, stemming from the reference in
 
 Batson
 
 to a ‘pattern’ of strikes, are inconsistent with the inherently fact-intense nature of determining whether the prima facie requirement has been satisfied.” 99-2615 at 22, 802 So.2d at 550. This Court further held it is important for the defendant to come forward with facts, not just numbers alone, 11Bwhen asking the district court to find a prima facie case.
 
 Id.
 
 (citing
 
 Moore,
 
 895 F.2d at 485). Consequently, in
 
 Duncan
 
 this Court held the defendant’s reliance on bare statistics to support a prima facie case of race discrimination was misplaced.
 

 Applying
 
 Duncan
 
 to the instant case, we hold the defendant’s reliance upon statistics alone does not support a prima facie case of race discrimination. The record reveals the state struck 62% of the prospective black jurors and about 22% of the prospective white jurors, using roughly the same number of strikes to excuse members of each race. Although there is a disparity in the state’s use of its peremptory challenges, defendant failed to present any facts to support a prima facie case of purposeful discrimination, as required in
 
 Duncan.
 
 The defense correctly asserts
 
 Johnson v. California
 
 held a prosecutor’s refusal to provide race-neutral reasons provides additional support for a prima facie case of discrimination, noting:
 

 In the unlikely hypothetical in which the prosecutor declines to respond to a trial judge’s inquiry regarding his justifica
 
 *618
 
 tion for making a strike, the evidence before the judge would consist not only of the original facts from which the pri-ma facie case was established, but also the prosecutor’s refusal to justify his strike in light of the court’s request. Such a refusal would provide additional support for the inference of discrimination raised by a defendant’s prima facie case.
 

 545 U.S. 162, 171, n. 6, 125 S.Ct. 2410, 2417, 162 L.Ed.2d 129 (2005). It is clear from the above language, however, a prosecutor’s refusal is not sufficient to raise an inference of discrimination, but may provide
 
 further
 
 support when a defendant has
 
 already
 
 set forth sufficient facts to establish a prima facie case. In this case, the state did not object to the district court’s order to provide race-neutral reasons for its peremptory challenges, but rather requested clarification for the factual basis of the prima facie case. We find the state’s request for clarification was motivated by a desire for the court to make a more complete record of the basis upon which the order was made before deciding whether to seek appellate review or provide its | ^race-neutral reasons. Thus, we find the state’s request provides no support for defendant’s claim of discrimination.
 

 While a pattern of racial strikes was arguably present here and in
 
 Duncan,
 
 since the state used five of its eight peremptory challenges to strike prospective black jurors, this Court further held in
 
 Duncan
 
 a pattern of strikes is only one of the multiple factors that can be considered in making this fact-intense determination. 99-2615 at 24, 802 So.2d at 551. This Court explained, “[ijndeed, while
 
 Batson
 
 cites a ‘pattern of strikes’ as an example of the type of evidence that can give rise to an inference of discrimination, another equally significant example
 
 Batson
 
 cites is the voir dire.”
 
 Id.
 
 In
 
 State v. Jacobs,
 
 this Court rejected a similar attempt by the defendant to rely on bare statistics to show the trial court abused its discretion in failing to find a prima facie case of discrimination. 99-0991, pp. 6-7 (La.5/15/01); 803 So.2d 933, 940. After reviewing the voir dire in each case, this Court found the jurors struck by the state were predictable targets for peremptory challenge for reasons other than race and therefore, the challenges were not exercised in a discriminatory manner.
 
 Duncan,
 
 99-2615 at 25, 802 So.2d at 551;
 
 Jacobs,
 
 99-0991 at 7, 803 So.2d at 940.
 

 In the present case, defendant does not cite, nor do we discern from the prosecutor’s statements, questions, or comments during voir dire any inference the state exercised its peremptory challenges based on race. After reviewing the record, .it is clear the state posed the same questions in the same manner to all prospective jurors, regardless of race. The five prospective black jurors whom the state peremptorily challenged include Howard Paige, Willie King, Jr., Irma Edwards, Marvin Jefferson, and Theresa Williams. During its
 
 Batson
 
 challenge, the defense claimed most of the black jurors struck by the state were neutral, rating themselves as “fours” or “fives” on the defense’s seven-point scale, while the state kept a significant number of white jurors who also rated themselves as “fours.” 117However, most of the jurors also rated themselves as “fours” on the state’s five-point scale, indicating they leaned toward imposing a life sentence. By relying upon its own rating scale, the defense has erroneously characterized all of the black jurors as neutral.
 

 While the record in this case does not indicate which prospective jurors were stricken by the state or the defense, it does show the only jurors remaining before jury selection who rated themselves
 
 *619
 
 as a “four” or “five” on the state’s rating scale were Elizabeth Whittington, Howard Paige, Faye McGraw, Willie King, Jr., Irma Edwards, Marvin Jefferson, Seth Thomas, and Charles Walters, Jr. When the state objected to the district court’s order requiring the state to give its race-neutral reasons, the state asserted it struck all eight of the aforementioned jurors, representing a mixture of white and black men and women, because they all rated themselves as a “four” on the state’s scale.
 
 [6]
 
 Since a rating of “four” or higher on the State’s scale indicates these jurors favored life imprisonment over a death sentence, an unfavorable position to the state, the record clearly supports a race-neutral reason for the state’s peremptory challenges of Paige, King, Jr., Edwards, and Jefferson.
 

 A closer inspection of the individual voir dire of the five prospective black jurors peremptorily challenged by the state further supports the district court’s ruling that the defense failed to establish a systematic pattern of exclusion based on race. During voir dire questioning, Howard Paige told the state and the defense he did not like the death penalty and never answered the defense’s request to give the best arguments for and against it. When the defense suggested that some crimes are so severe they warrant the death penalty, Paige responded, “[y]es, a brutal murder. Like murdering a child or something like that. I don’t disagree with you, 118I cannot consider the death penalty.” Not only do Paige’s responses suggest he favors life imprisonment over the death penalty, they also show he does not have a clear opinion about when he would impose death over a life sentence. Consequently, we find Paige’s voir dire testimony, combined with rating himself as a “four” on the state’s rating scale, provided a race-neutral reason for the state’s peremptory challenge.
 

 Irma Edwards, the only remaining juror who rated herself as a “five” on the state’s scale, similarly expressed strong feelings against the death penalty. Edwards told the prosecutor she did not like the death penalty, she did not think the jury should be able to impose it, and she felt strongly she could not impose the death penalty. She also told the prosecutor she would not be able to follow the judge’s instruction to consider the death penalty and it would substantially impair her ability to be a juror in this case. When talking to the defense during voir dire, however, Edwards seemed equivocal about her ability to consider or impose a death sentence. For instance, she told the defense she would automatically vote for a life sentence if someone was convicted of first degree murder, but then said if someone was found guilty she could consider both penalties. Edwards later told the defense she did not know if she could vote for the death penalty and she did not think she could ever see herself voting for it, but then said she could follow the judge’s instructions and seriously consider imposing the death penalty. Since Edwards rated herself as a “five” on the state’s scale and repeatedly emphasized her inability to impose a death sentence, we find the record provided race-neutral reasons for the state to peremptorily challenge Edwards.
 

 Willie King, Jr., and Marvin Jefferson, who rated themselves as “fours” on the state’s scale, also expressed mixed emotions about the death penalty. When the prosecutor asked King whether he
 
 *620
 
 could actually vote to give someone the death penalty, King responded, “I possibly could.” However, King did not appear to 1^comprehend some of the prosecutor’s questions, or else could not formulate appropriate answers thereto, as evidenced by his responses. For instance, when the prosecutor asked him to give the best argument for and against the death penalty King said, “[t]he Bible says the man would grow weaker and wiser, and as I have grown, I’ve seen and heard of deaths in my time.... Man has become weaker and wiser.” Similarly, when the prosecutor asked what information he would want to know about the crime and about the perpetrator, King said he would want to know why they did it and then said, “[t]he deer is so beautiful, the squirrel is so beautiful, but once I pull the trigger, it doesn’t matter anymore. I don’t know if that’s the circumstance or not, but that’s what happens with me. I’m trying to relate myself to the circumstances of that person.” Considering King’s non-responsive answers regarding the death penalty and his inability to comprehend or respond to certain questions about capital punishment, we find the state had sufficient race-neutral reasons for excluding him from the jury.
 

 Marvin Jefferson also told the prosecutor he wavered about the death penalty. Jefferson said he would support it if small children were killed for no reason, but was unsure about his opinion if the case did not involve children. When the prosecutor asked if it was something Jefferson was wrestling with, he responded, “yeah.” Jefferson later told the prosecutor he “felt strongly that he could envision imposing the death penalty if the evidence warranted it,” and after looking at defendant in open court, even went so far as to say he could actually impose a death sentence on defendant. Later on during voir dire, however, Jefferson told the prosecutor his experience as a juror on a criminal jury several years earlier would somewhat hurt his ability to be fair and impartial or serve on the jury in this case. Jefferson said he did not like going through the jury process, but when asked whether he would be able to carry out his duties as a juror, he responded, “[o]h, yeah. I have no choice.” Viewing Jefferson’s responses as a |2nwhole, we find the district court did not abuse its discretion in failing to find an inference of discrimination in the state exercising a peremptory exception against him. Even though Jefferson stated he could vote for the death penalty, his response “I have no choice,” indicates he may have been reluctant to seriously consider the death penalty in this matter. Furthermore, the district court was able to observe Jefferson’s demeanor and hear his responses firsthand, and was therefore in a better position to decide whether the state’s peremptory challenge was motivated by race.
 

 Theresa Williams is the only prospective black juror peremptorily challenged by the state who rated herself as a “three” on the state’s scale, indicating she was neutral and open to imposing either penalty. However, Williams told the prosecutor she had mixed feelings about the death penalty and said she would have a different opinion about it if it was a family member who was murdered as opposed to someone she did not know. When the prosecutor further asked Williams whether she could ever consider imposing a death sentence when a family member was not involved Williams responded, “[i]f I had to, yes.” After the prosecutor explained the law never requires someone to vote for the death penalty, Williams said she could see herself voting for death if she felt it was appropriate and could vote to impose death specifically on defendant. Williams did
 
 *621
 
 not seem to understand a defendant’s Fifth Amendment rights, telling the prosecutor it means, “[y]ou have the right to speak or not speak because anything you say or don’t say can be used against you.” The prosecutor further explained the rights encompassed by the Fifth Amendment, after which Williams said she understood the Fifth Amendment and would be able to apply it if defendant chose not to testify.
 

 Although nothing during her voir dire testimony suggested Williams would be an unfavorable juror to the state, we find the district court did not abuse its |21 discretion by denying defendant’s
 
 Batson
 
 challenge of Williams. Our recent decision in
 
 State v. Draughn
 
 is instructive on the matter, wherein a black defendant similarly claimed the prosecutor exercised peremptory challenges to remove four blacks and two whites from the jury venire. 05-1825, p. 25 (La.1/17/07); 950 So.2d 583, 603. This Court has held, “the defendant may rely on the fact that peremptory challenges, by reason of the fact that they may be subjectively based, constitute a jury selection practice which may allow those who intend to discriminate to do so.”
 
 Id.
 
 (citing
 
 Johnson v. California,
 
 545 U.S. 162, 125 S.Ct. 2410, 162 L.Ed.2d 129 (2005)). However, this Court concluded the defense in
 
 Draughn
 
 failed to raise any relevant evidence to support an inference of discrimination beyond the number of whites and blacks excluded, explaining:
 

 Our review of the entire voir dire convinces us that the mere invocation of
 
 Batson
 
 when minority prospective jurors are peremptorily challenged in the trial of a minority defendant does not present sufficient evidence in this case to lead to an inference of purposeful discrimination. There is nothing in
 
 Bat-son,
 
 or indeed in
 
 Johnson,
 
 which would require such an automatic finding. Otherwise, there would be no need for the first Batson step in the trial of any defendant who was a member of a cognizable racial group whenever a peremptory challenge was raised to a prospective juror who was also a member of that racial group; the Supreme court’s holding in
 
 Johnson
 
 did not collapse the first step in the Batson analysis. We do not believe that
 
 Batson
 
 or
 
 Johnson
 
 can be read so broadly.
 

 05-1825 at pp. 25-26, 950 So.2d at 603. Without further argument or reasons presented by the defense in
 
 Draughn,
 
 this Court held the trial judge had nothing from which to draw an inference of purposeful discrimination.
 

 We find
 
 Draughn
 
 factually similar and therefore, directly applicable to this case. The only support offered for defendant’s
 
 Batson
 
 challenge here was a comparison of the number of white versus black jurors against whom the state exercised peremptory challenges. As in
 
 Draughn,
 
 we conclude there was nothing from which the district court could have drawn an inference of purposeful | ^discrimination. Moreover, the four additional factors we considered in
 
 Draughn,
 
 including the nature of the case, timing of the defense objection, racial makeup of the jury, and the trial judge’s opinion on the issue of discriminatory intent, similarly negate a finding of discriminatory intent on the state’s part. Although the nature of this case does present overt racial overtones because it involves a black defendant and a white victim, the other three factors weigh against a finding of discriminatory intent.
 

 The timing of the defense’s objection, which was made after the state exercised eleven peremptory challenges, stands in stark contrast to other cases in which the defense raises an objection immediately after the prospective juror is challenged. In
 
 Draughn,
 
 we found such , a late objection, while still timely under Louisiana law,
 
 *622
 
 weighed against an inference of discrimination. Similarly, here and in
 
 Draughn,
 
 the actual jury that heard defendant’s case was composed of eleven whites and one black juror. This Court has consistently held “although the mere presence of African American jurors does not necessarily defeat a
 
 Batson
 
 claim, the unanimity requirement of a capital case sentencing recommendation may be considered.”
 
 Draughn,
 
 05-1825 at 27, 950 So.2d. at 604 (citing
 
 State v. Tart,
 
 93-0772, p. 18 (La.2/9/96); 672 So.2d 116, 141,
 
 cert. denied,
 
 519 U.S. 934, 117 S.Ct. 310, 136 L.Ed.2d 227 (1996)). Further, the district court in this case, like that in
 
 Draughn,
 
 knew the state had one remaining peremptory challenge and did not use it to remove the black juror, thereby distinguishing this case from others in which all of the prospective black jurors were stricken. Lastly, unlike in
 
 Johnson
 
 where the trial judge thought the issue of the state’s discriminatory intent was “very close,” the district judge in this case clearly stated he found no systematic pattern of exclusion based on race.
 

 Based on the voir dire questioning, the additional factors from
 
 Draughn,
 
 and giving due deference to the district court’s factual determination on the issue, we 12sfmd the district court did not abuse its discretion in concluding defendant failed to establish a prima facie case of purposeful discrimination by the state. Consequently, we find defendant’s arguments on this issue unpersuasive.
 

 II. Challenge for Cause
 

 In this assignment of error, defendant contends the district court erred in denying six challenges for cause. Defendant asserts he exhausted all of his peremptory challenges, after which one of the challenged jurors sat on the jury. The state addresses each of these prospective jurors and argues their responses as a whole show they could serve in a fair and impartial manner. Therefore, the state contends, the cause challenges were properly denied.
 

 Under Louisiana law, a defendant may challenge a juror for cause if:
 

 (2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
 

 [[Image here]]
 

 (4) The juror will not accept the law as given to him by the court.
 

 La.C.Cr.P. art. 797(2) and (4). If a juror expresses a predisposition regarding the outcome of a trial, a challenge for cause should be granted.
 
 State v. Lee,
 
 559 So.2d 1310, 1318 (La.1990). A trial court is vested with broad discretion in ruling on challenges for cause, and these rulings will be reversed only when a review of the voir dire record as a whole reveals an abuse of discretion.
 
 State v. Blank,
 
 04-0204, p. 25 (La.4/11/07); 955 So.2d 90, 113;
 
 State v. Cross,
 
 93-1189, pp. 6-7 (La.6/30/95); 658 So.2d 683, 686-87. A prospective juror’s seemingly prejudicial response is not grounds for an automatic challenge for cause, and a district judge’s refusal to excuse him on the grounds of impartiality is not an abuse of discretion, if after further questioning the potential juror demonstrates a willingness and abilit^J^to decide the case impartially according to the law and evidence.
 
 State v. Kang,
 
 02-2812, p. 5 (La.10/21/03); 859 So.2d 649, 653 (citing
 
 Lee,
 
 559 So.2d at 1318;
 
 State v. Baldwin,
 
 388 So.2d 664, 671-72 (La.1980),
 
 cert. denied,
 
 449 U.S. 1103, 101 S.Ct. 901, 66 L.Ed.2d 830 (1981);
 
 State v. Allen,
 
 380
 
 *623
 
 So.2d 28, 30 (La.1980)). But a challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror’s responses as a whole reveal facts from which bias, prejudice or inability to render a judgment according to law may be reasonably implied.
 
 Kang,
 
 02-2812 at 5, 859 So.2d at 653;
 
 State v. Hallal,
 
 557 So.2d 1388, 1389-90 (La.1990).
 

 Prejudice is presumed when a district court erroneously denies a challenge for cause and the defendant ultimately exhausts his peremptory challenges.
 
 Blank,
 
 04-0204 at 25, 955 So.2d at 113;
 
 Kang,
 
 02-2812 at 3, 859 So.2d at 651;
 
 State v. Robertson,
 
 92-2660, p. 3 (La.1/14/94); 630 So.2d 1278, 1280. Thus, to prove there has been an error warranting reversal of a conviction and sentence, a defendant need only show: 1) the trial court’s erroneous denial of the challenge for cause; and 2) the use of all peremptory challenges.
 
 Kang,
 
 02-2812 at 3, 859 So.2d at 652;
 
 Cross,
 
 93-1189 at 6, 658 So.2d at 686;
 
 Robertson,
 
 92-2660 at 3, 630 So.2d at 1281;
 
 Lee,
 
 559 So.2d at 1316. In Louisiana, a defendant must also use one of his peremptory challenges curatively to remove the juror or waive any complaint on appeal.
 
 Blank,
 
 04-0204 at 25, 955 So.2d at 113 (citing
 
 State v. Connolly,
 
 96-1680, p. 8 (La.7/1/97); 700 So.2d 810, 818;
 
 State v. Bourque,
 
 622 So.2d 198, 229-30 (La.1993)).
 

 In the present case, defendant exhausted all of his peremptory challenges, using some of them curatively. Therefore, his objection to the district court’s ruling on the challenges for cause is properly before this Court. We will address each of the challenged jurors individually.
 

 |;k1. Phillip Jackson: Defendant contends Jackson should have been excused due to his bias and partiality in favor of law enforcement witnesses. During voir dire, Jackson said he would automatically believe the testimony of a police officer unless the evidence showed it was untrue. When asked whether his opinion would change if the prosecutor told him this was not a good policy, Jackson said, “[n]o, I would believe the.police officer.... Now, I might lower to where I put his testimony. But as you said, he may be wrong and not know he is wrong.... I do believe that he [police officer] thinks what he says.” Jackson was subsequently questioned outside the presence of the other prospective jurors, during which the following exchange occurred with the prosecutor:
 

 Q: Would you see a problem with that if jurors said to themselves, well, it doesn’t matter what they testify to, since they are a police officer I’m going the [sic] automatically believe whatever he says, I don’t care what he is crossed on, I don’t care what’s [sic] comes about from the evidence, since he’s a police officer, I am going to automatically believe him?
 

 A: Well, yeah. I think I was trying to say, though, I believe — I accept his testimony as he believes it.
 

 Q: All right.
 

 A: Then I would rank it as to where I would place it in my decision.
 

 [[Image here]]
 

 Q: To the extent that police officers are scheduled to testify in this trial, if we put a police officer on the stand, would you be able to assess that police officer’s credibility and testimony as they testify in an individual manner like each officer that testifies?
 

 A: I can try.
 

 [[Image here]]
 

 Q: Would you be able to wait till [sic] their testimony was completed before you formed a decision as far as how credible they are or how truthful they
 
 *624
 
 are or their testimony as a whole, how much weight you’re going to give their testimony?
 

 l2nA: I believe so, yes.
 

 Q: So when I bring it back around, would you just automatically believe a police officer that comes in to testify before you’ve heard everything they’ve said?
 

 A: I would go under the assumption of believing him when he starts because of his position.
 

 [[Image here]]
 

 Q: With that in place, how would you treat police officer [sic] if we were to present it?
 

 A: Still I would have to accept it as being the truth until something that I hear or whatever objects to that — subjects that to question.
 

 The state contends Jackson was successfully rehabilitated since he qualified most of his answers by saying he would believe the testimony of a police officer “until proven different” and said he would wait to form an opinion regarding their credibility until after they testified. Defendant challenged Jackson for cause based upon his bias toward police officer testimony, his understanding of the law of principals, and his inability to understand the difference between general and specific intent. When the state objected, the district court failed to address defendant’s concerns regarding police officer testimony and instead found both attorneys had confused prospective jurors with their questions. The court denied the challenge for cause, finding Jackson, when questioned individually, showed he understood and could follow the law. The defense then used one of its peremptory challenges to remove Jackson from the jury panel.
 

 Generally, an individual who will unquestionably credit the testimony of law enforcement officers over that of defense witnesses is not competent to serve as a juror.
 
 Kang,
 
 02-2812 at 4-5, 859 So.2d at 652-53 (citing
 
 State v. Allen,
 
 380 So.2d 28, 30 (La.1980);
 
 State v. Jones,
 
 282 So.2d 422, 431 (La.1973)). However, we find Jackson’s statements during voir dire do not indicate he would automatically 127give more weight to law enforcement testimony over that of lay witnesses. Instead, Jackson stated he would initially believe a police officer was telling the truth, but could change his mind if the evidence contradicted his testimony. If that were to happen, Jackson further explained, “I might lower to where I put his testimony” and “I would rank it as to where I would place it in my decision.” In
 
 State v. Johnson,
 
 this Court found no abuse of discretion when the trial judge denied a challenge for cause of a juror who initially responded he might give slightly more credence to the testimony of a deputy sheriff than other witnesses, but later said he understood officers were capable of committing errors and telling falsehoods. 324 So.2d 349, 352 (La.1975). In the present case, while Jackson initially said he would automatically believe law enforcement testimony he also acknowledged they could make mistakes and arrest innocent people for crimes they did not commit. Jackson’s testimony is also similar to that of the prospective juror in
 
 Johnson
 
 because they both said they would try to weigh the testimony of each witness according to the instructions given by the court. As such,
 
 Johnson
 
 supports the district court’s denial of the peremptory challenge.
 

 We further find Jackson’s testimony as a whole demonstrates he was not biased or prejudiced against defendant. Jackson ranked himself as a “three” on the state’s five-point scale, indicating he was neutral towards the death penalty, and told the prosecutor he could vote to impose the
 
 *625
 
 death penalty or a life sentence. Jackson stated he could consider any mitigating evidence presented by the defense and could have mercy on a defendant. Jackson also revealed he had previously served as a juror in a murder trial and had found the defendant not guilty. Despite this prior experience, Jackson repeatedly said he could find defendant guilty only if the evidence proves guilt beyond a reasonable doubt. Jackson told the prosecutor he believed in the presumption of innocence, explained that he actually had to apply this principle during his prior jury service, and said he would “stick with it” [28if he was selected as a juror in this case. When the prosecutor asked Jackson how he felt about a defendant’s Fifth Amendment right against self-incrimination, Jackson said “[w]ell, I’m one of the ones that would love to hear both sides, but I have been in cases where that person refused to testify, and I had to respect that.” Jackson subsequently told the prosecutor he felt strongly he would continue to afford defendant these constitutional rights if selected as a juror and could carry out the duties and responsibilities of a juror if he was selected.
 

 As previously discussed, the trial judge is vested with broad discretion in ruling on challenges for cause and only where it appears, upon review of the voir dire examination as a whole, the judge’s exercise of that discretion has been arbitrary or unreasonable, resulting in prejudice to the accused, will this Court reverse the ruling of the trial judge.
 
 State v. Lee,
 
 93-2810, p. 9 (La.5/23/94); 637 So.2d 102, 108; See
 
 State v. Blank,
 
 04-0204, p. 25 (La.4/11/07); 955 So.2d 90, 113 (citing
 
 State v. Cross,
 
 93-1189, pp. 6-7 (La.6/30/95); 658 So.2d 683, 686-87). This Court explained, “this is necessarily so because the trial judge has the benefit of seeing the facial expressions and hearing the vocal intonations of the members of the jury venire as they respond to questions by the parties’ attorneys. Such expressions and intonations are not readily apparent at the appellate level where review is based on a cold record.”
 
 Lee,
 
 93-2810 at 9, 637 So.2d at 108. Here, although Jackson’s statements during voir dire appear to raise questions regarding his ability to be impartial, the district court judge had the benefit of observing Jackson’s demeanor and hearing his responses first-hand and was therefore in a better position to determine whether Jackson would be fair and impartial in this case. As a trial judge’s decision regarding the denial of a challenge for cause is afforded great deference, we find defendant failed to show the district court abused its discretion in denying his challenge for cause.
 

 |2c|In reaching this conclusion we note our reasoning in
 
 State v. Kang,
 
 where this Court found the trial court did not abuse its discretion in denying the challenge for cause, explaining:
 

 Mr. Whitcomb did not state he would give more weight to an officer’s testimony regarding anything outside of his or her powers of observation, nor did he state he would automatically believe the testimony of an officer simply because he was a police officer. He simply indicated that because police officers are trained in powers of observation, he would probably give more weight to their observations.
 

 02-2812, p. 7 (La.10/21/03); 859 So.2d 649, 654. The above language suggests when a witness testifies he will unquestionably believe the testimony of a police officer due to his position rather than his trained observations, such testimony indicates the juror is biased. In contrast, this Court held in
 
 State v. Allen
 
 two challenges for cause were properly refused by the trial court when the prospective jurors initially
 
 *626
 
 indicated they would give more weight to the testimony of police officers, but subsequently demonstrated their willingness and ability to decide the case impartially by stating they would listen to all the testimony and consider all the facts before deciding to believe the officer. 380 So.2d 28, 29 (La.1980). In
 
 State v. Lindsey,
 
 this Court also reversed the court of appeal and held the challenged juror was competent to serve when she initially testified she would afford greater credibility to police testimony because they are trained observers, but later said she would not unquestionably credit police testimony over the testimony of civilians and would impartially evaluate the evidence at trial according to the instructions received from the court. 06-255, pp. 11-12 (La.1/17/07); 948 So.2d 105, 112-13.
 

 In the present case, although Jackson initially stated he would automatically believe a police officer’s testimony because of his position, he subsequently stated he could wait until the officer finished testifying before weighing the officer’s |sncredibility. Similar to
 
 Allen
 
 and
 
 Lindsey,
 
 in this case Jackson’s testimony reveals he would not “unquestionably credit police testimony” over that of lay witnesses, but would initially assume they were being truthful until the evidence or “something I hear” subjects it to question. Jackson further indicated he could weigh a police officer’s testimony along with other witness testimony when he stated, “I might lower to where I put his [police officer’s] testimony” and “I would rank it [police officer’s testimony] as to where I would place it in my decision.” Louisiana Revised Statute § 15:432 provides there is a presumption “that the witnesses have told the truth.” In
 
 Fridge v. Talbert,
 
 this Court held “[t]he presumption is that a witness on oath testifies honestly until the contrary is shown.” 180 La. 937, 158 So. 209, 212 (1934). In light of this presumption and Louisiana jurisprudence, we find Jackson’s voir dire, when viewed in its entirety, fails to show the district court judge abused his discretion in denying the challenge for cause.
 

 2. Julie Main: Defendant asserts Main was emotionally affected by the death of her son and therefore, could not impartially evaluate the victim impact evidence. During voir dire, Main said she believed death was an appropriate penalty under the general circumstances of the instant case, but also indicated she could keep an open mind, listen to all the evidence, consider all mitigating circumstances, and participate fully in deliberations. Main told the prosecutor she could consider either penalty, but rated herself as a “two” on the defense’s seven-point scale, leaning strongly in favor of death. Main further stated her sympathy would lie with the victim’s family and said she would have difficulty voting for a life sentence in the case of an intentional killing if victim impact evidence was presented.
 

 Based on her responses, Main was subjected to further examination out of the presence of the other prospective jurors. During this subsequent voir dire, | si Main explained choosing either verdict would be difficult for her, but said she would fairly consider a life sentence despite the presentation of victim impact evidence. However, she also stated that once the state proved an intentional murder was committed the burden would be on defendant to prove he was entitled to a life sentence; otherwise her default vote would be for death. The state subsequently asked Main a series of rehabilitating questions, through which Main agreed she leaned toward death because she was imagining a particularly horrible crime, but said she could fairly consider both penalties if she set aside the horrible scenario she had
 
 *627
 
 imagined. Main reiterated she would need to hear convincing mitigating evidence to return a verdict of life.
 

 During the general voir dire that followed, Main revealed her son had died from cancer seven years ago and became visibly upset when she mentioned it. As a result, she was subjected to individual voir dire on the issue, during which she explained the loss of her son still affects her emotionally on occasion. However, Main said her emotional response would not prevent her from being fair and impartial and further stated she would base her decision solely on the facts and evidence presented. Main denied that she became emotional when she saw Ms. Prock, stating “I think the only time I became emotional was when I had to say that my son had died.... ” Main further stated she would not base her decision on sympathy for Ms. Prock’s loss of her son.
 

 The defense challenged Main claiming she was too emotionally affected by the case to serve impartially. The state disagreed with the defense’s characterization of Main’s emotional reaction, contending the voir dire showed Main could be fair and impartial, basing her verdict on the facts and evidence. The district court judge, who directly observed Main’s responses during voir dire, concluded Main could be fair and impartial. The judge explained, “[s]he lost her son to due [sic] to cancer and it made her a little emotional, but she clearly stated l.^that she could set that aside and be a fair and impartial juror in this case.” Thus, the judge denied the challenge for cause. The defense then used one of its peremptory challenges to exclude Main from the panel.
 

 As previously discussed, a trial court is vested with broad discretion in ruling on challenges for cause and its rulings will not be reversed unless a review of the voir dire record as a whole reveals an abuse of discretion.
 
 State v. Cross,
 
 93-1189, pp. 6-7 (La.6/30/95); 658 So.2d 683, 686-87;
 
 State v. Robertson,
 
 92-2660, pp. 2-3 (La.1/14/94); 630 So.2d 1278, 1280. Deference is given to the trial court’s determination because the trial judge has the benefit of seeing the facial expressions and hearing the vocal intonations of the members of the jury venire as they respond to questions by the parties’ attorneys, which are not readily apparent at the appellate level where review is based on a cold record.
 
 State v. Lee,
 
 93-2810, p. 9 (La.5/23/94); 637 So.2d 102, 108. Here, the district court judge explained he was basing his ruling in part on his own observations of Main’s demeanor and we find no abuse of discretion present in the record.
 

 3. Bryan Keator: Defendant contends Keator was an unsuitable juror because his grandfather had been robbed in a home invasion, he said he would tend to believe a fireman over other witnesses, and despite the state’s efforts to rehabilitate him, Keator clung to the belief that all persons involved in a murder are equally culpable. During voir dire, Keator rated himself as a “two” on the state’s five-point scale or a “three” on the defense’s seven-point scale, leaning slightly in favor of death. Keator told the prosecutor he could vote to impose the death penalty, which he thinks serves as a deterrent. However, Keator told defense counsel his position toward the death penalty had changed since the prior day, explaining it would be more difficult for him to impose the death penalty, but he would still be leaning slightly toward death “if the crime was grievous enough.” Keator also considers life in prison to be a severe sentence. Keator said he could |ssconsider all mitigating circumstances, but the victim impact testimony from the victim’s family would “weigh heavily” on the sentence he imposed. Although it would be difficult to
 
 *628
 
 vote for a life sentence after hearing victim impact testimony, Keator clarified “[i]t doesn’t mean I couldn’t do it.” Keator further stated he could impose whichever penalty he thought was appropriate.
 

 During general voir dire, Keator revealed his grandfather had been the victim of an armed home invasion three years ago and he was disappointed the perpetrator was never caught. Keator also disclosed his brother-in-law had been charged with a misdemeanor involving marijuana and when asked if that situation would hurt his ability to be a fair juror, Keator responded “[h]e is an idiot.” Keator then told defense counsel he would trust firefighters with his life because he works at a sulfuric acid plant, but said he would not automatically believe their testimony. Instead, Keator said he understood firefighters are witnesses just like anyone else and he would consider their testimony in that light. Keator further said pulling a gun shows a specific intent to kill or inflict great bodily harm and expressed doubt about the fairness of the statutory definition of first degree murder. In the individual voir dire that followed, Keator said his views on capital punishment had “softened” since death qualification and he would now place himself in the middle of the state’s five-point scale. The state subsequently clarified the difference between first degree murder with specific intent and second degree murder and Keator said he understood the difference. When the district court denied the challenge, the defense exercised a peremptory challenge to exclude Keator from the panel.
 

 As noted above, a trial court is vested with broad discretion in ruling on challenges for cause and its rulings will not be reversed unless a review of the voir dire record as a whole reveals an abuse of discretion.
 
 State v. Cross,
 
 93-1189, pp. 6-7 (La.6/30/95); 658 So.2d 683, 686-87;
 
 State v. Robertson,
 
 92-2660, pp. 2-3 (La.1/14/94); 630 So.2d 1278, 1280. A refusal by a trial judge to excuse a prospective juror on the ground that he is not impartial is not an abuse of discretion where, after further inquiry or instruction, the potential juror has demonstrated a willingness and ability to decide the case impartially according to the law and the evidence.
 
 State v. Jacobs,
 
 99-1659, p. 5 (La.6/29/01); 789 So.2d 1280, 1284 (citing
 
 Robertson,
 
 96-2660 at 4, 630 So.2d at 1281). Despite some of Keator’s initial responses in the present case, he indicated he could be fair and impartial and follow the law as instructed. Thus, we find Keator was successfully rehabilitated on each area of concern. No abuse of discretion is apparent in the district court’s ruling.
 

 4. Theresa Yeates: Defendant challenged Yeates for cause based upon her prior experience as a juror in another death penalty case tried by Alan Golden, a member of defendant’s own defense team, claiming her experience in that case was “too fraught with the possibility of prejudice.” Yeates indicated she generally supports the death penalty but said it would need to be “a pretty open-and-shut case” before she could vote for it. However, Yeates further stated she could actually vote for the death penalty and revealed she had served as a juror in a capital trial fifteen years ago. Yeates considered herself equally open to both penalties and said she would want to know everything about the defendant’s past, why he committed the crime, and whether it was done intentionally before deciding on the appropriate sentence.
 

 During general voir dire, Yeates answered additional questions about her pri- or jury service. She stated the jury in that case found defendant Brandon Haynes guilty of first degree murder and the jury could not unanimously agree on
 
 *629
 
 the penalty but she leaned in favor of death. Yeates told the prosecutor she would be able to set aside that experience and verdict and base a decision on the facts and evidence of this case. Yeates further told the prosecutor she knew two of the | ¡^firefighters on the state’s potential witness list solely as customers at the bank where she works, which holds an annual barbecue for firefighters and the police department. Yeates told the prosecutor she would assess their testimony as she would any other witness in the case and would not give them any more or less weight just because she knew them. Yeates also told the prosecutor she could be a fair and impartial juror in this case.
 

 In individual voir dire, Yeates said Alan Golden, defendant’s attorney, looked vaguely familiar but could not remember where she knew him from. The defense challenged Yeates for cause because she had voted for death in the Haynes case and she might recall Golden was lead counsel on that case as the current trial progressed forward. The defense also speculated Yeates might recognize other witnesses once she sees them at trial or even recognize the victim as a customer. The state objected to the challenge, arguing Yeates said she could set her experience at the Haynes trial aside and decide the present case solely on the facts and evidence presented at trial. The district court judge denied the challenge for cause, concluding Yeates clearly stated she could be fair and impartial and set her prior jury experience aside when deciding this case. The judge found Yeates’ prior jury service was not a valid reason to grant a challenge for cause, noting attorney Golden performed well at the Haynes trial and therefore, there was no reason to believe Yeates would hold anything against him if she did remember him. Further, the district court judge found Yeates’ potential exposure to any witnesses was minimal and would not affect her service. After the court denied the challenge, the defense used a peremptory challenge to remove Yeates from the panel.
 

 It is well settled that prior jury service in a similar case, standing alone, is not enough to sustain a challenge for cause.
 
 State v. Lee,
 
 93-2810, p. 8 (La.5/23/94); 637 So.2d 102, 107 (citing
 
 State v. Labostrie,
 
 358 So.2d 1243 (La.1978)); See also
 
 United States v. Riebschlaeger,
 
 528 F.2d 1031, 1032-33 (5th Cir.), cert.
 
 denied,
 
 429 U.S. 828, 97 S.Ct. 86, 50 L.Ed.2d 91 (1976). In
 
 Labostrie,
 
 even though the challenged juror sat on a similar case the previous day involving the same witness and found the witness’ testimony convincing, this Court held this “does not of itself make him partial.” 358 So.2d at 1247. After reviewing the challenged juror’s voir dire testimony as a whole, this Court affirmed the denial of the challenge for cause. This Court similarly affirmed the denial of a challenge for cause in
 
 Lee,
 
 where the prosecutor made references to questions and “understandings” from the challenged juror’s prior jury service, concluding the prosecutor was merely trying to save time by avoiding repetitious questioning and defense counsel was not prohibited from questioning jurors about any of the references made. 93-2810 at 9, 637 So.2d at 108. Federal courts have also held prior and even recent service by a juror on a jury which has tried a similar case, alone, is not sufficient to sustain a challenge for cause.
 
 United States v. Franklin,
 
 700 F.2d 1241, 1242 (10th Cir.1983);
 
 United States v. Mobley,
 
 656 F.2d 988, 989 (5th Cir.1981);
 
 United States v. Jefferson,
 
 569 F.2d 260, 261 (5th Cir.1978). A juror who has sat on a similar criminal case before being selected for the case in which he is challenged is subject to exclusion for cause only if actual bias is shown.
 
 Franklin,
 
 700 F.2d at 1242;
 
 *630
 

 Mobley,
 
 656 F.2d at 989;
 
 Jefferson,
 
 569 F.2d at 261.
 

 Here, Yeates’ prior jury service occurred over a decade ago in a case dissimilar to the one at bar. In the Haynes case, the state charged defendant with first degree murder, contending defendant abducted, raped, robbed, and tortured the victim before he either threw her or forced her off the roof.
 
 Haynes v. Cain,
 
 272 F.3d 757, 759 (5th Cir.2001),
 
 rev’d en banc,
 
 298 F.3d 375 (5th Cir.2002),
 
 cert. denied,
 
 537 U.S. 1072, 123 S.Ct. 676, 154 L.Ed.2d 567 (2002). Although defendant claims serious questions remain regarding Golden’s performance in
 
 Haynes,
 
 we find his reliance upon the dissenting opinion in the Fifth Circuit en |37banc opinion unpersuasive.
 
 [7]
 
 Further, the allegation of bias is wholly speculative, and consequently, we conclude defendant failed to show actual bias on Yeates’ part. After reviewing Yeates’ voir dire testimony as a whole, we affirm the district court’s denial of the challenge for cause, finding no abuse of discretion.
 

 5. Cheryl Mouser: Defendant contends Mouser could not serve fairly and impartially due to her engagement to a Shreveport detective and because she has been robbed twice at gunpoint. Defendant also asserts Mouser leaned strongly toward death and would not consider a life sentence. Mouser originally rated herself as a “one” on the state’s five-point scale and said she believed strongly in the death penalty. Upon further questioning, however, she told the prosecutor she could consider both penalties and agreed with him that she was “probably a ‘two’ rather than a ‘one’ ” on that scale, even though her belief is “an eye for an eye.” Mouser indicated she could consider all mitigating circumstances, base her decision on the evidence presented, and possibly impose a life sentence for first degree murder based on the circumstances of the case. She similarly told defense counsel she would not automatically vote for death, but would base her decision on the circumstances of the case and all the evidence.
 

 Mouser subsequently revealed her fiancé is a homicide detective in Shreveport and she has been robbed twice at gunpoint, once in 1985 and again in 1995. Mouser said her fiancé was not associated with the case in any way and felt strongly she could be a fair and impartial juror if selected. Mouser also said the robberies would not affect her performance as a juror even though she was still angry at her general manager at her place of employment for allowing one robber |RSto make restitution and avoid prosecution. Mouser again emphasized she would base her verdict on the facts and the evidence. Mouser was not subject to individual questioning. Defense counsel challenged Mouser for cause based upon her engagement and experience as a crime victim. The state argued these issues had been addressed during voir dire and Mouser indicated she could serve fairly and impartially. In denying the challenge, the district court judge explained the robberies had occurred in 1985 and 1995, Mouser had been fully examined on the matters, and said she could put everything aside and be a fair and impartial juror. The judge emphasized Mouser’s anger was not directed toward the prosecution, but toward her employer. The judge further pointed out Mouser’s fiancé was not a wit
 
 *631
 
 ness in the present case and the Shreveport Police Department had little or no involvement in the case. Based upon her responses, the judge denied the challenge for cause.
 

 In Louisiana, the fact that a juror personally has been the victim of a crime will not necessarily preclude that juror from serving on a jury as long as the juror’s partiality has been unaffected.
 
 State v. Robinson,
 
 36,147, p. 11 (La.App. 2 Cir. 12/11/02); 833 So.2d 1207, 1214;
 
 State v. Thom,
 
 615 So.2d 355 (La.App. 5 Cir.1993); See
 
 State v. Collins,
 
 359 So.2d 174, 177 (La.1978);
 
 State v. Burton,
 
 09-0826, pp. 8-9 (La.App. 4 Cir. 7/14/10); 43 So.3d 1073, 1079,
 
 writ denied,
 
 10-1906 (La.2/11/11); 56 So.3d 999;
 
 State v. Hopkins,
 
 39,730, p. 16 (La.App. 2 Cir. 8/17/05); 908 So.2d 1265, 1277;
 
 State v. Eskano,
 
 00-101, p. 11 (La.App. 5 Cir. 1/30/01); 779 So.2d 148, 153-54. Courts have similarly upheld the denial of challenges for cause of prospective jurors whose relatives have been crime victims when the juror states he or she would be fair, impartial, and not prejudiced against the defendant.
 
 State v. Chambers,
 
 99-678, p. 6 (La.App. 3 Cir. 1/19/00); 758 So.2d 231, 235 (citing
 
 Thom,
 
 615 So.2d at 360;
 
 State v. Seals,
 
 95-0305, p. 10 (La.11/25/96); 684 So.2d 368, 376,
 
 reh’g denied, cert. denied,
 
 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997)). It is also well settled that a juror’s relationship to a law enforcement officer is not, of itself, grounds for a challenge for cause. Rather, the question presented is whether the prospective juror could assess the credibility of each witness independent of his or her relationship with members of law enforcement.
 
 State v. Manning,
 
 03-1982, p. 32 (La.10/19/04); 885 So.2d 1044, 1078-79;
 
 State v. Connolly,
 
 96-1680, pp. 11-12 (La.7/1/97); 700 So.2d 810, 818-19. Even in cases in which the prospective juror has close ties to law enforcement personnel, subsequent questioning by the state or the trial judge may rehabilitate the jurors’ initial responses. A challenge for cause should only be granted when the juror’s responses as a whole reveal facts from which bias, prejudice, or inability to render a fair judgment may be reasonably inferred.
 
 State v. Kang,
 
 02-2812, p. 5 (La.10/21/03); 859 So.2d 649, 653.
 

 In the present case, we find Mouser’s voir dire testimony as a whole clearly shows her willingness to be a fair and impartial juror. Nothing in the record suggests Mouser’s experience as a crime victim would bias her or that she would view a law enforcement witness differently from any other witness. Under these circumstances, we find the district court judge did not abuse his discretion in denying defendant’s challenge for cause of Mouser.
 

 6. Vickie Tallant: Defendant challenged Tallant for cause because she had heard about the case on the news the night before jury selection. Defendant also claims Tallant was biased because her father is a fire captain from the same fire department as the victim and the state’s case involved a large number of firefighter witnesses who testified regarding the victim’s service to the community. Defendant relies upon a Ninth Circuit case, which held jurors who were employed as bank tellers should have been excused for cause in a case involving a bank robbery, as bank tellers have good reason to fear bank robberies, which are frequently associated with violence.
 
 United States v. Allsup,
 
 566 F.2d 68, 71-72 (9th Cir.1977). Defendant argues Tallant should have similarly been excused because the daughter of a fire captain would have good reason to fear her father being burned to death. However, the state contends Tallant’s circumstances are much more remote than those described in
 
 Allsup,
 
 since her own
 
 *632
 
 employment had nothing to do with firefighting and she testified she was not close to her father. The state acknowledges Tallant admitted this case “hits close to home,” but she also testified she was equally open to either the death penalty or life imprisonment. The district court judge denied the challenge for cause and because defendant had exhausted his peremptory strikes, Tallant ultimately served on the jury.
 

 During voir dire, Tallant indicated she had heard about the case in the news but had not formed any preconceived notions about defendant’s guilt or innocence and would be able to base her decision on the facts and evidence of the case. Tallant also said she believes in the death penalty as a deterrent, but thinks both punishments are appropriate. Tallant rated herself as a “three” on the state’s five-point scale and said she could follow the judge’s instructions and consider any and all mitigating evidence presented by the defense. Tallant subsequently disclosed her father is a retired fire captain and she was concerned about her ability to be fair. However, Tallant said she could actually see herself imposing a life sentence in the absence of mitigating evidence and would participate fully in deliberations.
 

 Tallant was briefly questioned individually about media exposure and her father. Tallant explained she had heard on the news that defendant was accused of killing the victim during a robbery and setting his mother’s house on fire, but she reiterated she had formed no opinions about the case. Tallant then said she did not know the victim or whether her father worked with the victim and explained she had an estranged relationship with her father. Tal-lant said her parents divorced when she was eleven years old and the full extent of their current contact is receiving two cards from him a year. Defendant challenged Tallant for cause | abased solely on media exposure and the state claimed her exposure was minimal. The district court judge denied the challenge, noting he was satisfied with Tallant’s answers that she could serve fairly and impartially. Under the jurisprudence described above, we find no abuse of discretion is apparent in the district court’s ruling.
 

 III. Sufficiency of the Evidence
 

 In this assignment of error, defendant argues the evidence is insufficient to support a conviction for first degree murder and a death sentence because it was based upon the unreliable accomplice testimony of Randy Wilson. Defendant asserts Wilson’s testimony is the only evidence defendant played a direct role in the murder. Consequently, if Wilson’s testimony is correctly disregarded, defendant contends there remains no direct evidence from which a jury could rationally conclude he killed Joe Prock. Defendant argues Wilson’s testimony must be disregarded for the following reasons: (1) Wilson testified pursuant to a last minute plea agreement to escape a capital prosecution; (2) Wilson’s testimony is both internally inconsistent and inconsistent with his prior statements; and (3) Wilson admitted he lied in the past and there is nothing to suggest his trial testimony was truthful. Defendant also contends the jury’s determination in the penalty phase violates due process because it is based on Wilson’s unreliable trial testimony.
 

 In response, the state asserts defendant mischaracterizes the strength of the other evidence against him and ignores the jury’s role in evaluating the credibility of witnesses. The state emphasizes the following evidence: the numerous sightings of defendant’s car at and near the crime scene as well as in conjunction with Ms. Prock’s stolen car, and the cell phone tow
 
 *633
 
 er records showing defendant’s movements on the day of the home invasion. The state also relies upon the gun with Joe Prock’s blood on it, which was found in the home of defendant’s ^girlfriend, as well as the defendant’s primary role in hiding the proceeds of the burglary. Even without Wilson’s testimony, the state argues there was sufficient evidence presented to convict defendant of first degree murder. The state also asserts, the jury found Wilson’s testimony credible even though he admitted to lying when he was originally interviewed by law enforcement. Thus, the state argues the jury’s determination in the penalty phase was rational and notes defendant did not object on this basis in district court.
 

 When an appellate court reviews a sufficiency of the evidence claim, the standard applied is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.
 
 Jackson v. Virginia,
 
 443 U.S. 307, 318-19, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979);
 
 State v. Captville,
 
 448 So.2d 676, 678 (La.1984). This standard has been codified by our legislature in Louisiana Code of Criminal Procedure article 821, which provides: “A post verdict judgment of acquittal shall be granted only if the court finds that the evidence, viewed in a light most favorable to the state, does not reasonably permit a finding of guilty.” When circumstantial evidence is used to prove the commission of the offense, Louisiana Revised Statute § 15:438 mandates, “assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.”
 
 State v. Neal,
 
 00-0674, p. 9 (La.6/29/01); 796 So.2d 649, 657,
 
 cert. denied,
 
 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002). This is not a separate test that applies instead of a sufficiency of the evidence test when circumstantial evidence forms the basis of the conviction.
 
 State v. Cummings,
 
 95-1377, p. 4 (La.2/28/96); 668 So.2d 1132, 1134. Rather, all of the evidence, both direct and circumstantial, must be sufficient under
 
 Jackson
 
 to convince a rational juror the defendant is guilty beyond a reasonable doubt. It is [ 43not the function of the appellate court to assess credibility or reweigh the evidence.
 
 Id.
 

 To convict defendant of first degree murder, the state was required to prove: (1) the defendant specifically intended to kill the victim during the perpetration or attempted perpetration of an aggravated burglary, aggravated rape, aggravated kidnapping, aggravated arson, aggravated escape, armed robbery or simple robbery; (2) the defendant knowingly created a risk of death or great bodily harm to more than one person; and (3) the defendant has offered, has been offered, has given, or has received anything of value for the killing. La. R.S. § 14:30(A)(1), (3), and (4). However, the question before this Court is not whether the evidence was legally sufficient to prove specific intent, but whether it was legally sufficient to prove defendant’s identity as the perpetrator. The primary evidence defendant was the perpetrator is the trial testimony of his co-perpetrator, Randy Wilson. Defendant alleges Wilson committed the murder and falsely implicated defendant to avoid the death penalty.
 

 In cases where the key issue is the defendant’s identity as the perpetrator, rather than whether the crime was committed, the state is required to negate any reasonable probability of misidentification.
 
 Neal,
 
 00-0674 at 11, 796 So.2d at 658 (citing
 
 State v. Smith,
 
 430 So.2d 31, 45 (La.1983)). A positive identification by only one witness is sufficient to support a conviction.
 
 Id.;
 
 See
 
 State v. Mussall,
 
 523
 
 *634
 
 So.2d 1305, 1311 (La.1988). A victim’s or witness’s testimony alone is usually sufficient to support the verdict, as appellate courts will not second-guess the credibility determinations of the fact finder beyond the constitutional standard of sufficiency.
 
 State v. Davis,
 
 02-1043, p. 3 (La.6/27/03); 848 So.2d
 
 557, 559.
 
 In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness’s testimony, if believed by the fact finder, is sufficient |44support for a requisite factual conclusion.
 
 State v. Robinson,
 
 02-1869, p. 16 (La.4/14/04); 874 So.2d 66, 79.
 

 A jury may also convict upon a co-defendant’s uncorroborated testimony.
 
 State v. Matthews,
 
 450 So.2d 644 (La.1984);
 
 State v. Hopkins,
 
 39,258, p. 10 (La.App. 2 Cir. 3/2/05); 897 So.2d 854, 862. An accomplice is qualified to testify against a co-perpetrator even if the prosecution offers him inducements to testify and such inducements would merely affect the witness’s credibility.
 
 Hopkins,
 
 39,258 at 10, 897 So.2d at 862 (citing
 
 State v. Neal,
 
 00-0674 at 11-12, 796 So.2d at 658). A conviction can even be based on the uncorroborated testimony of an accomplice or of someone making a plea bargain with the government, provided the testimony is not incredible or otherwise insubstantial on its face.
 
 Neal,
 
 00-0674 at 12, 796 So.2d at 659 (citing
 
 United States v. Osum,
 
 943 F.2d 1394, 1405 (5th Cir.1991)). Testimony should not be declared incredible as a matter of law unless it asserts facts the witness physically could not have observed or events that could not have occurred under the laws of nature.
 
 Id.
 
 The Fifth Circuit reiterated this high threshold of showing “incredible or otherwise insubstantial” accomplice testimony in
 
 United States v. Cravero,
 
 530 F.2d 666 (5th Cir.1976), where the court held:
 

 We believe that for the testimony to be incredible it must be unbelievable on its face. The fact that Lipsky has consistently lied in the past, engaged in various criminal activities, thought that his testimony would benefit him, and showed elements of mental instability does not make his testimony incredible. Lipsky’s testimony on direct is quite plausible. This is not a case where a witness testifies to facts that he physically could not have possibly observed or events that could not have occurred under the laws of nature. To be sure Lipsky was thoroughly impeached on cross-examination, but one cannot say that his testimony could not have been believed by a reasonable jury.
 

 Cravero,
 
 530 F.2d at 670-71 (citation omitted).
 

 |4sWe find Wilson’s testimony was not incredible or insubstantial on its face and was corroborated by other evidence. Despite defendant’s emphasis on the discrepancies in Wilson’s testimony and pre-trial statements, and Wilson’s admission that he consistently lied in the past, engaged in various criminal activities, and thought his testimony would benefit him, these do not make his testimony incredible as a matter of law. Applying
 
 Neal,
 
 we conclude Wilson did not testify to facts he “physically could not have observed or events that could not have occurred under the laws of nature.” 00-0674 at 12, 796 So.2d at 659. Wilson’s testimony is consistent with the physical evidence and clearly demonstrates he took part in the home invasion. As a result, there is no basis under the prevailing standard of appellate review to conclude his testimony could not have been believed by a reasonable jury.
 

 Furthermore, the jury heard Ms. Prock repeatedly testify the taller man, Wilson, wielded the gun and subsequently heard Wilson testify defendant brought the gun and used it to bludgeon the victim to death. Even though Wilson
 
 *635
 
 admitted he had lied when he made his initial statements to law enforcement, the jury accepted Wilson’s testimony implicating defendant. The trier of fact makes credibility determinations and may, within the bounds of rationality, accept or reject the testimony of any witness. A reviewing court may impinge upon the fact finder’s discretion only to the extent necessary to guarantee the fundamental due process of law.
 
 Neal,
 
 00-0674 at 11, 796 So.2d at 658 (citing
 
 State v. Mussall,
 
 523 So.2d 1305, 1310 (La.1988)); See also
 
 United States v. Lindell,
 
 881 F.2d 1313, 1322 (5th Cir.1989). Defendant’s reliance upon
 
 State v. Hobley,
 
 which addresses the need for reliable evidence to substantiate unadjudicated criminal conduct, is therefore misplaced. 98-2460, pp. 8-9 (La.12/15/99); 752 So.2d 771, 778. Thus, we find there was sufficient evidence for the jury to convict defendant and sentence him to death.
 

 |
 
 A,JV. Endemic Racism
 

 In this assignment of error, defendant contends the presence of a confederate flag memorial outside of the courthouse in Caddo Parish injects an arbitrary factor-race-into the capital sentencing decision.
 
 [8]
 
 Defendant argues this Court should, as a matter of greater protection afforded by state law, reject the burden of proof in
 
 McCleskey v. Kemp,
 
 which requires a defendant to establish specific evidence of discriminatory intent beyond discriminatory effect before being entitled to relief. 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987). Defendant admits he cannot prove the confederate flag memorial was placed outside the courthouse with the intent to interpose racial considerations, to both intimidate prospective black jurors and prime white jurors to impose the death penalty, into his specific case. However, he argues it was placed there to remind all persons who approach the courthouse of an era when lynching and enslavement of blacks was permitted by law.
 

 Defendant emphasizes one prospective juror, Carl Staples, indicated he could not serve on a jury in a courthouse with a confederate display nearby.
 
 [9]
 
 Finally, defendant asserts his Fourteenth Amendment right to equal protection of law was violated by state and parish sponsorship of this display. Defendant alleges the land on which the display currently sits and an additional $10,000 was donated to the Daughters of the Confederacy in 1903 by the Caddo Parish Police Jury, and the property and display is currently maintained by the parish. Defendant argues a discriminatory intent may be inferred from: (1) the display of the confederate battle flag; (2) the ideology of the Daughters of the Confederacy, which defendant characterizes as an all-female, white supremacy group with close ties to the Ku Klux Klan; and (3) the timing of the addition of the flag to the memorial in 1951 at 147the dawn of the civil rights movement. The state argues there was no objection made at trial on this basis and therefore, defendant has made numerous allegations that are outside the record, have not been tested by the adversarial process, and which the state has had no opportunity to rebut in the district court.
 

 Although this Court can likely take judicial notice that the display of a confederate flag would be offensive to some,
 
 [10]
 
 defen
 
 *636
 
 dant did not raise an objection on this or any other related basis in the court below and is raising these concerns for the first time on appeal. Louisiana Code of Criminal Procedure article 841(A) provides:
 

 An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. A bill of exceptions to rulings or orders is unnecessary. It is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take, or of his objections to the action of the court, and the grounds therefor.
 

 In
 
 Segura v. Frank,
 
 this Court noted, “[t]he general rule is that appellate courts will not consider issues raised for the first time on appeal.” 93-1271, p. 15 (La.1/14/94); 630 So.2d 714, 725 (citing
 
 Fried v. Bradley,
 
 219 La. 59, 87, 52 So.2d 247, 257 (1950) (cases cited therein)). This Court has consistently emphasized the goal of the contemporaneous objection rule of La.C.Cr.P. art. 841(A), “to promote judicial efficiency by preventing a defendant from gambling for a favorable verdict and then, upon conviction, resorting to appeal on errors which either could have been avoided or corrected at the time or should have put an immediate halt to the | ^proceedings” is just as valid in the penalty phase as in the guilt phase.
 
 State v. Cooks,
 
 97-0999, p. 21 (La.9/9/98); 720 So.2d 637, 649 (quoting
 
 State v. Taylor,
 
 93-2201, p. 7 (La.2/28/96); 669 So.2d 364, 368). In
 
 State v. Wessinger,
 
 this Court held a contemporaneous objection is required to preserve review of errors in both phases of a capital trial. 98-1234, pp. 19-20 (La.5/28/99); 736 So.2d 162, 180-81. However, “[i]n the event that an error that warranted reversal was not objected to contemporaneously in the trial court, that error will be discovered during our mandatory direct review.” 98-1234 at 20, 736 So.2d at 181.
 

 Since defendant failed to raise an objection regarding the confederate flag memorial in the district court, we find his claims regarding endemic racism are not properly before the Court. La.C.Cr.P. art. 841;
 
 Segura,
 
 93-1271 at 15, 630 So.2d at 725; cf.
 
 United States v. Williams,
 
 504 U.S. 36, 41, 112 S.Ct. 1735, 1738, 118 L.Ed.2d 352 (1992) (“Our traditional rule, as the dissent correctly notes, precludes a grant of certiorari only when the question presented was not pressed or passed on below”). Moreover, defendant virtually concedes his claim must fail under
 
 McCleskey v. Kemp,
 
 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987). In
 
 McCleskey,
 
 the defendant attacked Georgia’s capital sentencing scheme based on the Baldus study, a famous statistical analysis of over 2,000 murder cases in Georgia in the 1970’s conducted by Professor David Baldus. The statistics purport to show a disparity in the imposition of the death sentence in Georgia based on the race of the murder victim and, to a lesser extent, the race of
 
 *637
 
 the defendant. 481 U.S. at 286, 107 S.Ct. at 1764. The defendant in
 
 McCleskey
 
 argued the Baldus study shows black defendants, such as McCleskey, who kill white victims have the greatest likelihood of receiving the death penalty. 481 U.S. at 287, 107 S.Ct. at 1764.
 

 In considering McCleskey’s equal protection claim, the Supreme Court conceded it has accepted statistics as proof of intent to discriminate in certain |49limited contexts, such as the selection of jury venires, or in Title VII civil rights actions. 481 U.S. at 293-94, 107 S.Ct. at 1767-68. Nevertheless, the Court held:
 

 But the nature of the capital sentencing decision, and the relationship of the statistics to that decision, are fundamentally different from the corresponding elements in the venire-selection or Title VII cases.... [E]ach particular decision to impose the death penalty is made by a petit jury selected from a properly constituted venire. Each jury is unique in its composition, and the Constitution requires that its decision rest on consideration of innumerable factors that vary according to the characteristics of the individual defendant and the facts of the particular capital offense.
 

 481 U.S. at 294, 107 S.Ct. at 1768 (citations omitted). Consequently, the Court found applying an inference drawn from the general statistics to a specific decision in a trial and sentencing is not comparable to applying an inference drawn from general statistics to a specific venire-selection or a Title VII case. 481 U.S. at 294-95, 107 S.Ct. at 1768. According to the Court, the Baldus study only shows a discrepancy in sentences that appears to correlate with race, which is an inevitable part of our criminal justice system. 481 U.S. at 312, 107 S.Ct. at 1778. In light of the safeguards designed to minimize racial bias in the process, the fundamental value of jury trial in our criminal justice system and the benefits that discretion provides to criminal defendants, the Court found the Baldus study does not demonstrate a constitutionally significant risk of racial bias affecting the Georgia capital sentencing process. 481 U.S. at 313, 107 S.Ct. at 1778. The Court also pointed out the venire-selection and Title VII cases provide the decision maker with an opportunity to explain the statistical disparity, whereas in McCles-key’s case the state had no practical opportunity to rebut the Baldus study. 481 U.S. at 296, 107 S.Ct. at 1769. Moreover, the Court held “[bjecause discretion is essential to the criminal justice process, we would demand exceptionally clear proof before we would infer that the discretion has been abused.” 481 U.S. at 297, 107 S.Ct. at 1770. Thus, the Court concluded the Baldus study was “clearly insufficient to |finsupport an inference that any of the decisionmakers in McCleskey’s case acted with discriminatory purpose.”
 
 Id.
 

 More pertinent to the present case, McCleskey argued the state of Georgia as a whole had acted with a discriminatory purpose by adopting the capital punishment statute and allowing it to remain in force despite its allegedly discriminatory application. The Supreme Court, however, held discriminatory purpose implies the decision maker selected or reaffirmed a particular course of action at least partly “because of,” not merely “in spite of’ its adverse effects on an identifiable group. Thus, for McCleskey’s claim to prevail, McCleskey had to prove the Georgia Legislature enacted or maintained the death penalty statute because of an anticipated racially discriminatory effect. 481 U.S. at 298, 107 S.Ct. at 1770. To the contrary, the Court found no evidence the Georgia Legislature enacted the capital punishment statute to further a racially discriminatory purpose.
 

 
 *638
 
 Similarly, in the present case, even conceding Caddo Parish placed the confederate memorial outside the district courthouse at the turn of the century, refurbishing and reaffirming it half a century later with the confederate battle flag, defendant has made no showing the parish currently maintains the memorial because of the adverse affect it would have on the administration of the criminal justice system with respect to black defendants. Defendant also failed to show the memorial creates an environment giving rise to a constitutionally significant and unacceptable risk that one or more of the jurors in his ease acted with discriminatory intent in returning his or her verdict, particularly at the sentencing stage of the proceedings, on the basis of his color and not on the moral culpability of his acts and his individual character.
 

 CAPITAL SENTENCE REVIEW
 

 In the discharge of the duty imposed by the legislature to “review every sentence of death to determine if it is excessive,” La.C.Cr.P. art. 905.9, this Court | jflwill review the record in a capital case to determine: (1) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors; (2) whether the evidence supports the jury’s finding of a statutory aggravating circumstance; and (3) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. La. S.Ct. R. 28, § 1. In the present case, Rule 28 review demonstrates defendant’s death sentence is not excessive.
 

 Passion, Prejudice, or Other Arbitrary Factors
 

 There are very few potential sources of passion, prejudice, or other arbitrary factors in the instant case, aside from the allegations that: (1) racism pervades Cad-do Parish, which defendant contends is the best predictor of who will face a capital prosecution in that parish; and (2) the potentially actual perpetrator of the murder, Randy Wilson, escaped capital prosecution by presenting false testimony against defendant. As discussed above, however, defendant did not present the former claim to the district court where the necessary factual development could occur and therefore, the claim consists of unsupported and untested allegations. As for the latter claim, despite Wilson’s admission that he had lied several times, the jury apparently found Wilson’s testimony credible.
 

 Defendant also claims the state flooded the guilt phase with irrelevant evidence of the victim’s character and the impact his death had on his family and members of the community, which violated his right to a fair trial and reliable sentence determination. However, we find defendant’s characterization is not supported by the record. None of the testimony appears, as transcribed at least, to have been overly emotional or overly descriptive of the victim’s good qualities. In
 
 State v. Gradley,
 
 this Court held the testimony of four family members during the guilt phase was not victim-impact evidence because their testimony was very brief, non-dramatic, and recounted facts about the crime scene and elements of the state’s | Si>case and did not describe the character of the victim or the impact of the crime on the surviving family members. 97-0641, p. 14 (La.5/19/98); 745 So.2d 1160, 1168-69. Similarly, in this case the testimony of two bystanders, three family members, and four firefighters who responded to the fire was relatively brief and concentrated on the facts of the crime. These witnesses made minimal statements regarding the victim’s character and the impact of the crime on the family members. More importantly, the
 
 *639
 
 guilt phase testimony prompted no objection from the defense on this basis.
 

 Beyond those concerns, the record does not reveal any potential indicia of passion, prejudice, or arbitrariness. Defendant, an adult black male, killed a white retired fireman and received a sentence of death from a jury consisting of eleven whites and one black, during the selection of which the district court properly denied defendant’s
 
 Batson
 
 challenges. Although defendant attributes the verdict to racism, defendant’s allegations in this regard were not made timely and were not developed in the record.
 

 Aggravating Circumstances
 

 As demonstrated by the jury’s verdict during the guilt phase of the trial, the state presented sufficient evidence to prove beyond a reasonable doubt defendant killed the victim while engaged in an aggravated arson, armed robbery, and second degree kidnapping, and had the specific intent to kill or inflict great bodily harm upon more than one person. As previously discussed, review of the record shows the evidence was sufficient to support such a determination. A mixture of blood containing the defendant and the victim’s DNA was identified on the handgun found in defendant’s residence. A plastic trim piece apparently fell off defendant’s car and was found in the victim’s driveway. Numerous witnesses reported seeing defendant’s car in the vicinity of the crime scene at the time of the murder. Cell phone tower records also placed defendant in the area on the day of the murder. IssFinally, a principal to the offense described defendant’s role in the murder and an accessory after the fact described how defendant concealed property stolen in the course of the crime. Although defendant presented an alibi when questioned by detectives, the alibi was contradicted by other witnesses.
 

 Proportionality
 

 The federal Constitution does not require a proportionality review.
 
 Pulley v. Harris,
 
 465 U.S. 37, 42-51, 104 S.Ct. 871, 875-79, 79 L.Ed.2d 29 (1984). However, comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana.
 
 State v. Burrell,
 
 561 So.2d 692, 711-712 (La.1990);
 
 State v. Wille,
 
 559 So.2d 1321, 1341-42 (La.1990) (citing
 
 State v. Kyles,
 
 513 So.2d 265 (La.1987));
 
 State v. Thompson,
 
 516 So.2d 349, 357 (La.1987). This Court has only set aside one death penalty as disproportionately excessive under the post-1976 statutes, after finding a large number of persuasive mitigating factors and the defendant’s relatively minor role in the creation of the aggravating circumstances.
 
 State v. Sonnier,
 
 380 So.2d 1, 9 (La.1979). In
 
 State v. Weiland,
 
 although the defendant’s conviction and sentence were reversed as a result of the trial court’s erroneous exclusion of crucial mitigating evidence, this Court also noted the death penalty “appears disproportionate.” 505 So.2d 702, 710 (La.1987).
 

 The Uniform Capital Sentence Report reveals defendant is a black male born on October 25,1973. He was thirty-two years old at the time of the offense and is now thirty-seven years old. He is married but separated and has three children he does not support. Defendant completed the ninth grade with deficits in reading, math, and written language. He has a sporadic employment history and was unemployed at the time of the murder. Defendant has prior convictions for drug offenses and attempted armed robbery, as well as numerous arrests. As a child, defendant was often unattended as a result of his mother’s drug use and father’s | .^incarceration, which resulted in several injuries that required medical attention. Defendant re
 
 *640
 
 ports he has used and sold drugs since age ten.
 

 According to the state, since 1976 there have been forty-two persons tried for first degree murder in Caddo Parish, of which seventeen resulted in a death sentence with three reversals.
 
 [11]
 
 Of those death sentences not reversed, three involved the murder of a victim over the age of fifty, one involved the murder of a child, eight were committed during the course of an armed robbery or aggravated burglary, and four involved the murder of multiple victims. Of those sentences vacated, two reversals resulted from
 
 Batson
 
 violations.
 

 A review of the capital verdicts from Caddo Parish does not suggest Felton De-juan Dorsey received a disproportionately harsh sentence. Four cases in Caddo Parish involved murders committed in the course of home invasions. In
 
 State v. Cooks,
 
 Michael Cooks along with four others entered a home in Shreveport on January 20, 1995, to steal marijuana from the occupants. 97-0999, pp. 1-2 (La.9/9/98); 720 So.2d 637, 639. A struggle ensued and Cooks shot and killed one victim and directed the shooting of two other surviving victims. In
 
 State v. Draughn,
 
 Cornell White found his sixty-four year old mother, Lauretta White, lying on her kitchen floor in a pool of blood on April 10, 2000. 05-1825, pp. 2-3 (La.1/17/07); 950 So.2d 583, 590. She had been stabbed over sixty-one times. It was determined that Darrell Draughn, a neighbor, killed her in the course of robbing her. In
 
 State v. Edwards,
 
 Cedric Edwards and an accomplice shot and killed Victoria Kennedy and shot and beat Gerald Kennedy while robbing them at their apartment in Shreveport on October 27, 1995. 97-1797, pp.
 
 2-4
 
 (La.7/2/99); 750 So.2d 893, 897-98. Gerald received multiple skull fractures but survived. Finally, in
 
 State v. Holmes,
 
 Brandy Holmes and her boyfriend forced their way into the home of seventy year-old Julian Brandon and sixty-eight year old Alice Brandon on January 1, 2003, where they shot Julian and robbed Alice. 06-2988, pp. 2-3 (La.12/2/08); 5 So.3d 42, 49. They then stabbed and slashed Julian to death and shot Alice in the head.
 

 Although the present defendant engaged in somewhat less brutality than that exhibited by Draughn or Holmes, the present case does not appear out of place when viewed in the context of these four others. Defendant tied a seventy-nine year old woman to a chair, ransacked her home, bludgeoned her fifty-two year old son to death with sufficient force to cause his broken skull to lacerate his brain, set him on fire, and left the woman tied to a chair in her burning home. Notably, a statewide review of cases reveals jurors generally consider death to be the appropriate penalty for murders committed in the home. See
 
 Holmes,
 
 06-2988 at 85, 5 So.3d at 97 (“This Court has observed that Louisiana juries appear especially prone to impose capital punishment for crimes committed in the home.”) (collecting cases);
 
 State v. Anderson,
 
 06-2987, p. 68 (La.9/9/08); 996 So.2d 973, 1019 (same); See also
 
 State v. Wingo,
 
 457 So.2d 1159, 1170 (La.1984) (“[T]he murder of a person by an intruder who violated the sanctuary of the victims’ own home [is] a particularly terrifying sort of crime to decent, lawabid-
 
 *641
 
 ing people.”). Furthermore, as noted above, defendant was thirty-two years old at the time of the offense. This Court has affirmed death verdicts for defendants as young as seventeen years old at the time of the offense.
 
 State v. Comeaux,
 
 93-2729 (La.7/1/97); 699 So.2d 16;
 
 State v. Craig,
 
 95-2499 (La.5/20/97); 699 So.2d 865,
 
 cert. denied,
 
 522 U.S. 935, 118 S.Ct. 343, 139 L.Ed.2d 266 (1997);;
 
 State v. Prejean,
 
 379 So.2d 240 (La.1979),
 
 cert. denied,
 
 449 U.S. 891, 101 S.Ct. 253, 66 L.Ed.2d 119 (1980). Compared to these cases, the death penalty imposed on defendant, 15fiFelton Dejuan Dorsey, for the first degree murder of Joe Prock is not disproportionate.
 

 DECREE
 

 For the reasons assigned herein, the defendant’s conviction and death sentence is affirmed. This judgment becomes final on direct review when either: (a) the defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under its prevailing rules, for rehearing of denial of certiorari; or (b) that Court denies his petition for rehearing. The district court shall upon receiving notice from this Court of finality of direct appeal under La. C.Cr.P. art. 923, and before signing the warrant of execution, as provided by La. R.S. 15:567(B), immediately notify the Louisiana Indigent Defense Assistance Board and provide the Board with a reasonable time in which: (1) to enroll counsel to represent the defendant in any state post-conviction proceedings, if appropriate, pursuant to its authority under La. R.S. 15:169; and (2) to litigate expeditiously the claims raised in that application, if filed in the state courts.
 

 AFFIRMED
 

 [1]
 

 . According to the district court, eight prospective black jurors remained after death qualification. The state used peremptory challenges to strike five, the defense used a peremptory challenge to strike one, one served on the jury, and the jury was selected before the last prospective black juror was reached.
 

 [2]
 

 . Detective Leonard “Andy” Scoggins, the lead investigator, testified Ms. Prock’s Mercury Marquis was subsequently found in the 3100 block of Morningside where it had been abandoned and set on fire.
 

 [3]
 

 . Wilson is 5'8" and defendant is 5'5".
 

 [4]
 

 . La.C.Cr.P. art. 795 provides in pertinent part:
 

 C. No peremptory challenge made by the state or the defendant shall be based solely upon the race or gender of the juror. If an objection is made that the state or defense has excluded a juror solely on the basis of race or gender, and a prima facie case supporting that objection is made by the objecting party, the court may demand a satisfactory race or gender neutral reason for the exercise of the challenge, unless the court is satisfied that such reason is apparent from the voir dire examination of the juror. Such demand and disclosure, if required by the court, shall be made outside of the hearing of any juror or prospective juror.
 

 D. The court shall allow to stand each peremptory challenge exercised for a race or gender neutral reason either apparent from the examination or disclosed by coun
 
 *616
 
 sel when required by the court. The provisions of Paragraph C and this Paragraph shall not apply when both the state and the defense have exercised a challenge against the same juror.
 

 [5]
 

 . Specifically, it is clear from the record the state excused every prospective juror, white or black, who rated himself or herself as a "four’’ on the state's scale. While responding to defendant’s
 
 Batson
 
 challenge, the state named eight prospective jurors who were cut-two white women, two white men, three black men, and one black woman — because they all rated themselves as a "four” on the state's scale.
 

 [6]
 

 . Although the state claimed Irma Edwards also rated herself as a "four” on its scale, the record shows she rated herself as a “five” out of five, 'meaning life imprisonment was the only penalty she could impose.
 

 [7]
 

 . Defendant cites the dissenting opinion, which states “No trial can be considered constitutionally fair when an attorney is given the authority to override the accused's wishes to concede nothing and hold the government to its burden of proof on each criminal charge.”
 
 Haynes v. Cain,
 
 298 F.3d 375, 387 (5th Cir.2002) (en banc) (Parker, J., Weiner, J., and Demoss, J., dissenting).
 

 [8]
 

 . An amicus brief filed by various parties raises essentially the same arguments.
 

 [9]
 

 . This prospective juror voiced his concerns out of the presence of the others and no impact on the jury pool is apparent in the record.
 

 [10]
 

 . See
 
 Scott v. Sch. Bd. of Alachua County,
 
 324 F.3d 1246, 1249 (11th Cir.2003),
 
 cert. denied,
 
 540 U.S. 824, 124 S.Ct. 156, 157
 
 *636
 
 L.Ed.2d 46 (2003) (observing the confederate flag has multiple "emotionally charged” meanings and is viewed by some as a symbol of white supremacy and racism, while others view it as a symbol of heritage):
 
 United States v.
 
 Blanding, 250 F.3d 858, 861 (4th Cir.2001) (per curiam) ("It is the sincerely held view of many Americans, of all races, that the confederate flag is a symbol of racial separation and oppression. And, unfortunately, as uncomfortable as it is to admit, there are still those today who affirm allegiance to the confederate flag precisely because, for them, the flag is identified with racial separation. Because there are citizens who not only continue to hold separatists views, but who revere the confederate flag precisely for its symbolism of those views, it is not an irrational inference that one who displays the confederate flag
 
 may
 
 harbor racial bias against African-Americans.”)
 

 [11]
 

 . Defendant sharply disputes the state’s numbers and alleges there have been at least 344 first degree murder cases in Caddo Parish since 1976, of which over 95% did not result in a death sentence. Defendant reaches this number by considering cases identified by the appellate courts as starting as first degree cases, cases identified in the Clerk of Court's office where the defendant was initially indicted for first degree murder and received a life sentence or less, and cases with second degree murder indictments where the police arrest report indicated facts that would substantiate a first degree indictment.