NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

12-1008

STATE OF LOUISIANA

VERSUS

KENNETH EARL STEELMAN

**********

APPEAL FROM THE
ELEVENTH JUDICIAL DISTRICT COURT
PARISH OF SABINE, NO. 68258
HONORABLE STEPHEN B. BEASLEY, DISTRICT JUDGE

**********

**PHYLLIS M. KEATY**
**JUDGE**

**********

Court composed of Elizabeth A. Pickett, J. David Painter, and Phyllis M. Keaty, Judges.

**AFFIRMED.**

Don M. Burkett
District Attorney
Anna L. Garcie
Assistant District Attorney
Post Office Box 1557
Many, Louisiana  71449
(318) 256-6246
Counsel for Appellee:
        State of Louisiana

**Bryce J. Denny**
**Attorney At Law**
**209 Polk Street**
**Mansfield, Louisiana  71052**
**(318) 871-5007**
**Counsel for Defendant/Appellant:**
      **Kenneth Earl Steelman**

**KEATY, Judge.**

On September 20, 2010, Defendant, Kenneth Earl Steelman, was indicted by a grand jury with aggravated rape, in violation of La.R.S. 14:42. Following a bench trial, Defendant was found guilty as charged on February 15, 2012.[1] Defendant filed a motion for post verdict judgment of acquittal which was denied prior to sentencing. On June 7, 2012, Defendant was sentenced to serve life in prison without benefit of parole, probation, or suspension of sentence.

Defendant is now before this court on appeal, challenging his conviction. For the following reasons, Defendant's conviction is affirmed.

## FACTS

Prior to and during the marriage of Defendant and the victim's mother, Bridget Steelman, Defendant inappropriately touched and sexually violated the victim, his step-daughter A.D., on multiple occasions over the course of several years.

## DISCUSSION

### Errors Patent

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, we find no errors patent.

### Assignments of Error Numbers Two and Three

By these assignments of error, Defendant argues that the evidence was insufficient to support his conviction for aggravated rape. Defendant also contends that the trial court erred in denying his motion for post verdict judgment of acquittal. We will address these assignments of error first in the event Defendant is

---

[1] Defendant was also indicted with and found guilty of indecent behavior with a juvenile involving the victim's older sister, P.D. His appeal of that conviction is pending before this court in Docket Number 12-1009.

entitled to an acquittal. *See State v. Hearold*, 603 So.2d 731 (La.1992). "When the entirety of the evidence, including inadmissible evidence which was erroneously admitted, is insufficient to support the conviction, the accused must be discharged as to that crime, and any discussion by the court of the trial error issues as to that crime would be pure dicta since those issues are moot." *Id*. at 734.

## *Sufficiency of the Evidence*

The analysis for a claim of insufficient evidence is well settled:

> The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *State v. Mussall*, 523 So.2d 1305 (La.1988). A determination of the weight of evidence is a question of fact, resting solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witnesses. *State v. Silman*, 95-0154 (La.11/27/95), 663 So.2d 27, 35. A reviewing court may impinge on the factfinding function of the jury only to the extent necessary to assure the *Jackson* standard of review. *State v. Bordenave*, 95-2328 (La.4/26/96), 678 So.2d 19, 20. It is not the function of an appellate court to assess credibility or re-weigh the evidence. *Id*.

*State v. Macon*, 06-481, pp. 7-8 (La. 6/1/07), 957 So.2d 1280, 1285-86.

> A victim's or witness's testimony alone is usually sufficient to support the verdict, as appellate courts will not second-guess the credibility determinations of the fact finder beyond the constitutional standard of sufficiency. *State v. Davis*, 02-1043, p. 3 (La.6/27/03); 848 So.2d 557, 559. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the fact finder, is sufficient support for a requisite factual conclusion. *State v. Robinson*, 02-1869, p. 16 (La.4/14/04); 874 So.2d 66, 79.

*State v. Dorsey*, 10-216, p. 43-44 (La. 9/7/11), 74 So.3d 603, 634, *cert. denied*, ___ U.S. ___, 132 S.Ct. 1859 (2012); *see also State v. Simon*, 10-1111 (La.App. 3 Cir. 4/13/11), 62 So.3d 318, *writ denied*, 11-1008 (La. 11/4/11), 75 So.3d 922.

Aggravated rape is defined in La.R.S. 14:42, which reads in pertinent part:

> A. Aggravated rape is a rape committed . . . where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful

2

consent of the victim because it is committed under any one or more of the following circumstances:

. . . .

(4) When the victim is under the age of thirteen years. Lack of knowledge of the victim's age shall not be a defense.

On appeal, Defendant contends that A.D. and her older sister, P.D., were coached by relatives as to what to say during their videotaped interviews and at trial. Defendant maintains that the coaching shed doubt upon the candor and truthfulness of A.D. and P.D.'s testimonies. Defendant also complains that an alternate theory of innocence was not investigated involving the alleged molestation of A.D. and P.D. by their uncle. Defendant contends that the uncle's molestation of A.D. and P.D. would explain how they could testify in a sexually descriptive manner. Additionally, Defendant asserts that the lack of medical or psychiatric care for A.D. is highly inconsistent with an alleged rape and is suggestive of a manipulated claim. Lastly, Defendant points to alleged inconsistences in the testimonies of A.D. and P.D.

At trial, Detective Jason Rivers with the Sabine Parish Sheriff's Office testified that on August 2, 2010, A.D. and P.D.'s mother reported that her husband, Defendant herein, had made inappropriate advances and possibly sexual advances on A.D. and P.D. Defendant objected to the introduction of Mrs. Steelman's statement because she died prior to trial, thus, making her statement hearsay and hearsay within hearsay with regard to what her daughters stated to her. Before the trial court ruled on the objection, the State decided not to introduce Mrs. Steelman's statement into evidence.

Detective Rivers further testified that Defendant was interviewed on August 16, 2010. At the beginning of the interview, Defendant immediately reported that he had information that A.D. and P.D. were molested by their uncle. Detective

3

Rivers stopped Defendant from speaking further and then explained his *Miranda* rights. Defendant signed a waiver form and agreed to be interviewed. Detective Rivers ended the interview soon after it began because Defendant asked for an attorney.

Detective Rivers did not know if either A.D. or P.D. was referred for medical treatment or evaluation. He did not send them because there was no report of penetration and he did not want to put A.D. and P.D. through an examination if not necessary. Detective Rivers stated that he investigated Defendant's allegation that A.D. and P.D. were molested by an uncle by interviewing the uncle by telephone and by speaking with family members. At trial, neither party questioned Detective Rivers about the outcome of his investigation regarding the uncle.

On August 6, 2010, A.D. and P.D. were interviewed by Christy Pennison, a child forensic interviewer at the Rapides Children's Advocacy Center (RCAC) in Alexandria, Louisiana. A DVD recording and transcript of A.D.'s interview were introduced into evidence, and the video recording was played for the court. In her interview, A.D. reported that she was ten years old. Her biological father died when she was a toddler; thus, she never knew him. A.D. stated that the abuse started when she was about five years old when her mother married Defendant. Her mother was unaware that Defendant molested "kids" and that he had molested both her and her sister.

According to A.D., the abuse came to light as follows:

> A.D.: And he did a lot of things to me and he thought that I wouldn't tell nobody but he thought wrong because I did. I told my mama and I told my-- like my sister's best friend. She said she wouldn't tell nobody.
>
> . . . .

4

A.D.:  And I told her and she wasn't supposed to tell nobody but it came around on the phone and it went to like my-- my mama's friend-- other friend, Jessica.  She's like big Jess.

. . . .

A.D.:  And it went from, uh, little Jess to big Jess to Ms. Pam to my mom.  And we had to tell her what happened and I didn't want to because I was scared to.

MS. PENNISON:  Uh huh.

A.D.:  And I figured that she would have been mad at me since we didn't tell her a long time ago.

When asked about the details of the molestation, A.D. told Ms. Pennison that Defendant "messed" with her in her "social" areas and pointed to her breasts and vagina, saying that Defendant licked her vagina and played with her breasts. According to A.D., it happened often when her mother was not home.  Defendant would call her into his bedroom and begin touching her breasts and vagina with his hands.  Defendant would call her bad names when she refused his advances.  On two occasions, Defendant tried to insert his penis into A.D.'s vagina.  The most recent occasion was about a month and a half prior to her interview.  When she told Defendant that it hurt, he stated that he understood because it was too small. She asserted that it hurt a lot.  Defendant would touch A.D.'s breasts on top of her clothes and then try to remove her clothes.  Often times, she would resist when Defendant tried to remove her clothes.  A.D. saw "white stuff" come out of Defendant's penis.  Defendant instructed A.D. not to tell anyone.  She agreed not to tell her mother because her mother was too sick.

Ms. Pennison asked A.D. about her sister, and she related:

MS. PENNISON:  Okay.  What about your sister, do you think he [the Defendant] did anything to your sister?

A.D.:  I know that he tried – like she told me – like my mama told her like to get her story straight before we got up here.  But like

5

before we left the house, we was talking about what we were going to say and she said that he touched her boobs-

MS. PENNISON:  Uh huh.

A.D.:  And she just didn't (inaudible).

MS. PENNISON:  Well, and tell me more about that.  You said that your mom like was telling y'all to make sure you had your story straight before y'all came up here [advocacy center]?

A.D.:  Yeah.  Like to – like to tell the truth about what happened.

MS. PENNISON:  Uh huh, okay.  So y'all were talking about that before y'all came about making sure you tell the truth and stuff like that, okay.  Did you ever – did you ever see any of that happen between your step dad and your sister?

A.D.:  Like once.

. . . .

A.D.:  And like I was walking outside to go play basketball with my brother because he was out there too.

MS. PENNISON:  Uh huh.

A.D.:  And like I went outside and what he – when he was out there and I was going and he went back in and then like my sister was on the trampoline because she was out there too.  And he was in the house and he came out and he got on the trampoline and then he started doing stuff and I wasn't even looking.  I had the ball in my hand and I was starting to shoot and then I looked over and he started touching her boobs.

MS. PENNISON:  Then he started touching her boobs so you saw that happen?

A.D.:  (nodding affirmatively).

At trial, A.D., then twelve years old, recalled telling her friend, Jessica Hurd (Jess), that Defendant was "doing things" to her.  A.D. explained that she could not keep the secret any longer and needed to "get it out."  A.D. asked Jess not to tell anyone.

6

A.D. testified that Defendant touched her breasts and vagina with his hands both on top and beneath her clothing. He also touched her vagina with his penis with her clothes on and off. Defendant would rub his penis on her vagina, and he tried to put his penis into her vagina. After twice telling Defendant that he was hurting her, he stopped. A.D. saw something come from his penis at that time. A.D. stated that her mother was not home when the molestation occurred.

A.D. testified that she was hesitant to tell her mother about the abuse because her mother was already sick and under a lot of stress, and A.D. did not want to make it worse for her. Defendant told her not to tell anyone. A.D. maintained that her mother never asked her to lie about Defendant.

On cross-examination, A.D. recalled the day she went to the RCAC with P.D. and their aunt. Prior to leaving, she and P.D. talked with their mother about what they were going to say during their interviews. According to A.D., their mother told P.D. that she needed to get her story straight. A.D. also testified that her uncle had also touched her inappropriately.

A DVD recording and transcript of P.D.'s interview with Ms. Pennison were also introduced into evidence, and the video recording was played for the court. P.D. stated she was fifteen years old. She could not exactly recall when Defendant began to behave inappropriately with her. She was young, probably nine or ten years old, when Defendant married her mother. Defendant started "feeling" on P.D. and A.D. and tried to "mess" with them. Defendant touched P.D. "everywhere." P.D. stated that she did not want to be home alone with Defendant. The abuse usually occurred when P.D.'s mother was not home. Defendant also abused P.D. when her brother and A.D. were home. Her brother would be outside, and A.D. would be in another room. Defendant would ask P.D. if he could touch her. When she would say no, Defendant would get mad, call her a name, and walk

7

away. When Defendant did touch her inappropriately, she was wearing clothes, and he touched her on top of her clothing. Defendant touched P.D.'s breasts and vagina with his hands.

P.D. told Ms. Pennison that she was not sure where Defendant touched A.D. as she was not around when the Defendant abused A.D., and she never saw Defendant abuse A.D. P.D. told A.D. and her mother that Defendant was abusing her. The last time Defendant touched P.D. was about two months prior to the interview.

P.D. told Ms. Pennison that she had recently learned that Defendant had also had inappropriate sexual contact with her cousin, Ethel. P.D. explained:

> P.D.: Well, my cousin, Ethel, she told my grandma about it because she had to tell somebody and she ended up telling her grandma, her friends, her sister and she told one of her uncles.
>
> MS. PENNISON: Uh huh.
>
> P.D.: Which she told her grandma and her grandma told my mom and my mom got us and started talking about it and she—she told us she didn't want anything but the truth right now and tell her if he'd ever done anything to us. And then my sister just started saying stuff of what he really did and I joined in on it to tell her.

When asked how often she was abused by Defendant, P.D. told Ms. Pennison it was not often "because he'll do it like one time that day and then wait maybe awhile . . . or something like that. Because I wouldn't let him."

At trial, P.D., then seventeen years old, testified that she was eight years old when her mother married Defendant and the molestation began before their marriage. The abuse occurred when her mother was gone from the home or in a different room in the home. Defendant would walk into P.D.'s room and ask her if he could "mess" with her breasts or her vagina. Defendant touched her breasts and vagina with his hands, both on top of and beneath her clothing. On one occasion, Defendant tried to touch her vagina with his penis.

8

P.D. testified that she was sixteen years old when she told her mother about the abuse. She did not tell her mother sooner because she was scared that Defendant would get mad and hit her mother and her mother was already under a lot of stress at the time. Before P.D. told her mother of the abuse, A.D. told P.D. that Defendant was molesting her. P.D. told A.D. to try and stay away from Defendant because she did not want A.D. to be in the same position as herself. P.D. finally told her mother about the abuse once Defendant was no longer living with them. P.D. stated that she did speak to her mother about what happened to her and A.D, but she maintained that her mother never told her what to say to the police or to Ms. Pennison.

On cross-examination, P.D. testified that her aunt, Lisa Keese, drove her and A.D. to the RCAC. Her mother did not go with them. P.D. was then asked:

> Q All right. Before you went to Alexandria with your – with this group, did you and your mother and your sister have a conversation, right before you went to Alexandria, about what y'all were going to talk about?
>
> A No, sir.
>
> Q There was never anything – your mother never said for y'all to get your story straight or never told you to get your story straight?
>
> A No, sir.

P.D. was questioned about her prior statement wherein she indicated she had her clothing on when the abuse occurred. She maintained that her clothes were both on and off when Defendant touched her. P.D. testified that Defendant touched her approximately three times.

Pamela Hurd, a friend of A.D.'s mother, testified that her daughter, Jess, knew A.D. and P.D. Pamela frequently saw Mrs. Steelman on a social basis. Around the end of July 2010 and first part of August 2010, Pamela learned from

Jess that Defendant was molesting A.D. She then called Mrs. Steelman to investigate the allegation.

Jess testified that she was acquainted with A.D. and P.D. She stated that they were playing softball one day, and while in the dugout, A.D. told Jess that Defendant had been molesting her. A.D. also told her that on one occasion, she had to take a shower with Defendant before he allowed her to go to church with her grandmother. When Jess told A.D. that she needed to tell someone about the abuse, A.D. said she did not want to tell anyone. About a week later, Jess told her sister-in-law, Jessica Hurd (Jessica), about the abuse.

Kristen Steelman, Defendant's niece, testified that she was also friends with A.D. and P.D. According to Kristen, A.D. stated that she was tired of the way Defendant would discipline them when they misbehaved. Kristen testified that A.D. told her that she knew of a way to get Defendant out of the house and her life, and she was going to do it. When asked about A.D.'s plan, Kristen explained that the victim knew if she kept misbehaving and aggravating Defendant enough, he would discipline her, and in turn, her mother would kick him out of the house.

In *State v. Rideaux*, 05-446, p. 2 (La.App. 3 Cir. 11/2/05), 916 So.2d 488, 491 (citation omitted), this court observed the following ruling in *State v. Roca*, 03-1076 (La.App. 5 Cir. 1/13/04), 866 So.2d 867, *writ denied*, 04-583 (La. 7/2/04), 877 So.2d 143:

> In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual finding. In the case of sexual offenses, the testimony of the victim alone can be sufficient to establish the elements of a sexual offense, even where the State does not introduce medical, scientific or physical evidence to prove the commission of the offense.

We conclude that the testimony of A.D., alone, established that Defendant committed aggravated rape as defined in La.R.S. 14:42. Although A.D. stated that her mother told P.D. to get her story straight, A.D. subsequently clarified her statement, explaining that their mother wanted P.D. to tell the truth. There was no evidence adduced at trial to suggest that A.D. was coached or was not truthful in her assertions.

A.D.'s testimony did reflect that her uncle had also touched her inappropriately. However, aside from a single statement made by A.D., there was no other evidence adduced at trial to suggest that she learned of sexual acts from her uncle as opposed to Defendant or to show that her uncle touched her in the same manner as Defendant allegedly touched her. Although there was no evidence introduced at trial to show that either A.D. or P.D. received medical or psychiatric care, the lack of same is not suggestive of a manipulated claim considering the facts herein. Additionally, the health of A.D.'s mother was in jeopardy at the time she was apprised of the A.D.'s sexual abuse, and she subsequently passed away before trial. As such, the trial court's conclusion that the family's focus was on the declining health of A.D.'s mother, rather than on the medical and/or psychiatric care of A.D. and her sister, was reasonable.

Lastly, Defendant's assertion that A.D.'s testimony was "wildly inconsistent and contradictory" to P.D.'s testimony is not supported by the record. While minor inconsistencies are apparent, they fail to shed doubt on A.D.'s credibility.

After having reviewed the entire record in a light most favorable to the prosecution, we conclude that there was sufficient evidence to support Defendant's conviction for the aggravated rape of his step-daughter, A.D. Thus, there is no merit to Defendant's second assignment of error.

## *Motion for Post Verdict Judgment of Acquittal*

In assignment of error number three, Defendant contends that the trial court erred in denying his motion for post verdict judgment of acquittal. Defendant's motion for post verdict judgment of acquittal was filed on June 5, 2012. The claims asserted in the motion are the same claims raised by Defendant on appeal in the sufficiency of the evidence assignment of error. A hearing on the motion was held on June 7, 2012, without the introduction of any new evidence or argument heard at trial.

In *State v. Mead*, 36,131, p. 2 (La.App. 2 Cir. 8/14/02), 823 So.2d 1045, 1047, *writ denied*, 02-2384 (La. 3/14/03), 839 So.2d 34, the court stated:

> La.C.Cr.P. art. 821 provides that a motion for post-verdict judgment of acquittal shall be granted only if the court finds that the evidence, viewed in a light most favorable to the state, does not reasonably permit a finding of guilt. This is a question of legal sufficiency of the evidence

As mentioned previously, we have concluded that there was sufficient evidence to support Defendant's conviction for the aggravated rape of his step-daughter, A.D. Without the introduction of any new evidence at the hearing on Defendant's motion for post verdict judgment of acquittal and given the claims asserted in the motion are the same claims raised on appeal in the sufficiency assignment of error, the trial court did not err in denying the motion. Accordingly, Defendant's third assignment of error lacks merit.

## Assignment of Error Number One

By this assignment of error, Defendant argues that the trial court erred when it admitted the videotaped interviews of P.D. and A.D. into evidence. Defendant contends that a pre-interview "collusion" occurred between P.D., A.D., and their mother, who allegedly directed them to get their stories straight. Defendant maintains that Mrs. Steelman evaded the requirement of La.R.S. 15:440(A)(2) by

12

coaching P.D. and A.D. immediately prior to the taped interviews. Defendant also contends that the State made no effort to explain the alleged coaching. Lastly, Defendant asserts that the pre-interview coaching should be grounds for excluding the videotaped statements of P.D. and A.D.

Evidence in the form of video recording of a "protected person"[2] is admissible pursuant to La.R.S. 15:440.4, which reads in pertinent part:

> A. A videotape of a protected person may be offered in evidence either for or against a defendant. To render such a videotape competent evidence, it must be satisfactorily proved:
>
> (1) That such electronic recording was voluntarily made by the protected person.
>
> (2) That no relative of the protected person was present in the room where the recording was made.
>
> (3) That such recording was not made of answers to interrogatories calculated to lead the protected person to make any particular statement.
>
> (4) That the recording is accurate, has not been altered, and reflects what the protected person said.
>
> (5) That the taking of the protected person's statement was supervised by a physician, a social worker, a law enforcement officer, a licensed psychologist, a medical psychologist, a licensed professional counselor, or an authorized representative of the Department of Children and Family Services.

In the instant case, the State offered the testimony of Ms. Pennison, who received training in child forensic interviewing from the National Children's Advocacy Center in Huntsville, Alabama. According to Ms. Pennison, she was not trained to draw any conclusions or make opinions with regard to her interviews; she was trained to be purely objective in her interviewing. She worked at the RCAC for about two years in the role of child forensic interviewer. Ms. Pennison identified the videotaped interviews of A.D. and P.D., taken on August 6, 2010,

---

[2] According to La.R.S. 15:440.2(C), the term "protected person," as used in this statute, means, in pertinent part, any person who is a victim of a crime and is under the age of seventeen.

13

and she testified that the recording accurately depicted her interviews of A.D. and P.D.

Defendant objected to the introduction of the videotaped interviews pursuant to La.R.S. 15:440.4 and asserted that the interviews had to be supervised by a physician, social worker, law enforcement officer, licensed psychologist, medical psychologist, licensed professional counselor, or an authorized representative of the Department of Children and Family Services. Defendant stressed that Ms. Pennison did not indicate she was qualified under La.R.S. 15:440.4. Lastly, Defendant challenged the admissibility of the interview transcripts, arguing that they had no "*indicia* of reliability." Defendant maintained that the statements of A.D. and P.D. were tainted because they got together with their mother, discussed what they were going to say, and then immediately went to Alexandria to the RCAC. Defendant contended that the statements were unreliable because A.D. and P.D. had been coached.

Ms. Pennison testified that Detective Derrell Cassell escorted the victims to the center and was present for the interviews in a separate room where he monitored the interviews. Ms. Pennison wore an ear piece during the interviews so Detective Cassell could interject if he needed more information or for her to address certain things. The State subsequently re-urged that the recordings be shown to the court. Defendant continued to object on the basis of La.R.S. 15:440.4 and argued that the officer sitting outside the interview room, listening and watching, was not supervision. The trial court disagreed and overruled the objection on that basis. With regard to the reliability of the interview statements, the trial court noted that Defendant would have an opportunity to cross-examine P.D. and A.D.; thus, the objection was overruled. P.D.'s interview was viewed

14

first, followed by A.D.'s interview. Prior to A.D.'s interview being viewed, Defendant reiterated the same objection which was subsequently overruled.

Considering the record herein, we conclude that the video-recorded interviews of P.D. and A.D. met the admissibility requirements of La.R.S. 15:440.4. The record indicates that the video recordings of P.D. and A.D., protected persons under La.R.S. 15:440.4, were voluntarily given, and no relatives were in the room at the time of the recording. Additionally, Defendant does not suggest, nor does the record indicate, that the video recordings were made of answers to interrogatories calculated to lead the victims to make any particular statement. There was no evidence to show that the video recordings were inaccurate or had been altered. Lastly, the recorded interviews of P.D. and A.D. were supervised by a law enforcement officer.

The admissibility of a videotaped statement is addressed in La.R.S. 15:440.5, which reads in pertinent part:

> A. The videotape of an oral statement of the protected person made before the proceeding begins may be admissible into evidence if:
>
> (1) No attorney for either party was present when the statement was made;
>
> (2) The recording is both visual and oral and is recorded on film or videotape or by other electronic means;
>
> (3) The recording is accurate, has not been altered, and reflects what the witness or victim said;
>
> (4) The statement was not made in response to questioning calculated to lead the protected person to make a particular statement;
>
> (5) Every voice on the recording is identified;
>
> (6) The person conducting or supervising the interview of the protected person in the recording is present at the proceeding and available to testify or be cross-examined by either party;

(7) The defendant or the attorney for the defendant is afforded an opportunity to view the recording before it is offered into evidence; and

(8) The protected person is available to testify.

B. The admission into evidence of the videotape of a protected person as authorized herein shall not preclude the prosecution from calling the protected person as a witness or from taking the protected person's testimony outside of the courtroom as authorized in R.S. 15:283. Nothing in this Section shall be construed to prohibit the defendant's right of confrontation.

In the instant case, A.D. and P.D. both testified at trial and were subject to cross-examination by Defendant. Defendant does not allege, nor does the record reflect, that he was not provided copies of the video recordings.

The fact that A.D. and/or P.D. spoke with their mother before leaving home to go to the RCAC was considered by the trial court in determining the credibility of their statements and testimonies. The record consistently reflects that Mrs. Steelman instructed her daughters to tell the truth during their interviews. Accordingly, this assignment of error is without merit.

## DECREE

Defendant's conviction is affirmed.

**AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2–16.3.